419 F.2d 1138
 Betty Jean PINGATORE and Daniel F. Pingatore, Plaintiffs-Appellees,
v.
MONTGOMERY WARD AND COMPANY, Inc., Defendant-Appellant,
F. W. Woolworth Company, Defendant-Appellant.
MONTGOMERY WARD AND COMPANY, Inc., Cross-Plaintiff-Appellant,
v.
F. W. WOOLWORTH COMPANY, Cross-Defendant-Appellee.
 No. 19347.
 United States Court of Appeals Sixth Circuit.
 December 18, 1969.
 
 Addison D. Connor, Detroit, Mich., Butzel, Eaman, Long, Gust & Kennedy, Xhafer Orhan, Detroit, Mich., on brief, for Montgomery Ward & Co.
 William J. Weinstein, Detroit, Mich., Gussin, Weinstein & Kroll, Detroit, Mich., on brief, for Pingatore.
 Samuel A. Garzia, Detroit, Mich., Vandeveer, Haggerty, Doelle, Garzia, Tonkin & Kerr, Detroit, Mich., on brief, for F. W. Woolworth.
 Before PHILLIPS, Chief Judge, CELEBREZZE, Circuit Judge, and TAYLOR, District Judge.*
 ROBERT L. TAYLOR, District Judge.
 This is an appeal by Montgomery Ward and Company, Inc. from a judgment rendered on a verdict of the jury in the amount of $126,000.00 for Mrs. Pingatore and $25,000.00 for Mr. Pingatore. Plaintiffs, by amendment, made F. W. Woolworth a party-defendant and Ward sued Woolworth by cross-claim. A Jury returned a verdict in favor of Woolworth in the original action and the Court dismissed the cross-claim. The trial covered a three weeks' period.
 The parties will be referred to in their status in the Court below.
 
 Statement of the Case
 
 On January 3, 1962, Betty Jean Pingatore and her husband, Daniel F. Pingatore, along with their three children, drove to Ward's store at Seven Mile Road and Gratiot, Detroit. Woolworth operated a store in the same shopping center. Mrs. Pingatore went into Ward's store by way of the breezeway in back of the store, leaving the children and Mr. Pingatore in the car. After exchanging some gifts and making purchases, she walked into the breezeway from the store and as she moved aside to let people pass in the aisle of the breezeway, a rat leaped from the roof of the breezeway, got tangled in her skirts and bit her on the knee. She returned to the car and was taken to the hospital by her husband. The accident was reported to policemen at the hospital. After treatment at Saratoga Hospital, she and her husband returned to Ward's store and told a representative of Ward what had happened. Mr. Pingatore showed the representative where the accident occurred.
 Health inspectors of the City of Detroit visited the scene of the accident and found that rats had been living under six-inch skids supporting Ward's merchandise. There was no evidence that rats were harbored on the Woolworth property. The rat problem was discovered by Ward in 1960 or 1961 and had existed in the area for about five or six years. Thirty-six or thirty-seven rats had been killed at one time along the breezeway. There were rat tracks or runways of rats under the pallets.
 On January 5, 1962, plaintiff's family physician examined her and found a bite mark on her right knee and a scratch below the knee. Conforming to the standard practice in the Detroit area, he began a series of anti-rabies vaccinations. After the seventh injection, a serious reaction, symptomized by redness around the injected area, nausea, and a numbing and tingling in the right side, especially in the arm and leg, developed. The vaccinations were discontinued. Following a short stay in the Receiving Hospital for immediate treatment, plaintiff entered Herman Kiefer Hospital for further treatment of the reaction. Tests, including spinal punctures, only indicated a reaction to the vaccine. However, the numbness continued in the arm and leg, and plaintiff was still able to walk. She returned home and remained there until she could be admitted at St. Johns Hospital. During her three week stay there, her right leg became weaker, and finally she lost the use of it. The St. Johns' diagnosis was rabies vaccine reaction and paralysis in the right side, involving both the arm and leg. Later, she entered Michigan University Hospital, but the condition did not improve. After returning home, she was unable to do normal housework. She re-entered St. Johns Rehabilitation Center complaining of stomach trouble and numbness in her arm and leg. A physical therapist treated her at the Rehabilitation Center.
 At the trial she was unable to move her right arm or right leg. In a handwriting demonstration she grasped the pen in the index finger and thumb of her right hand and was able to write as her left hand grasped the right and provided movement.
 Plaintiff alleged development of conversion hysteria, a traumatic neurosis and a right hemiparesis involving both the arm and leg. Medical examination showed and plaintiff was told that no organic illness was responsible for the paralysis. Some of the doctors described her condition as conversion hysteria, a neurosis which simulated the paralysis of her right arm and leg and the dragging of her foot. One psychiatrist for plaintiff testified that she was not suffering from a neurosis but a psychosis. A doctor for defendant stated she was malingering.
 There was testimony by a psychiatrist that he treated her when she was eighteen years of age for anxiety problems When this same psychiatrist examined her shortly after the rat bite of January 3, 1962, he found that she was extremely "anxietous" at that time and had a relatively marked functional loss of the right arm and right leg. She was considerably more "anxietous" at that time than before. This psychiatrist examined and treated her between 70 and 80 times from the date of the rat bite until December, 1967.
 
 Assignments of Error
 
 1. Defendant contends that the District Judge erred in not granting a continuance because plaintiffs failed to give defendant a list of witnesses, their addresses and the subject matter of their testimony in the list that was furnished on December 14, 1967, as required by the pre-trial order.
 Defendant argues that the complaint charged that Mrs. Pingatore was suffering with "conversion hysteria," but that her trouble was psychotic, which is what the layman would call insanity; that her insanity originated when she was less than 2½ years old; that the opinion of Dr. Breiner was radically different from her claim of conversion hysteria and failure to comply with the pre-trial order prevented Ward from learning of Dr. Breiner's opinion of long-standing insanity.
 Plaintiffs argue that defendant was not prejudiced by their not giving the subject matter of Dr. Breiner's testimony since defendant had obtained all the hospital records pertaining to Mrs. Pingatore long before the trial. Dr. Gass, one of defendant's neurologists, had examined her as late as January 6, 1968, and she had submitted to three medical examinations inaugurated by the defendant since the commencement of the litigation. Also, Dr. Gass had reported to the defendant subsequent to his examination on July 1, 1963, it was possible all of the plaintiff's complaints were purely on a functional or on a traumatic neurosis basis and a psychiatrist's opinion of her condition would be important. Dr. Harnett, another doctor of defendant, examined her on December 22, 1966, and reported that her rightsided weakness was almost wholly functional or hysterical and that she had a conversion reaction. The testimony of Dr. Breiner was not objected to and he was cross-examined extensively. An adjournment of the case was not requested. He stated that the rat bite and the rabies injections were the precipitating factors that caused the paralysis.
 On December 27, 1967, plaintiffs' counsel offered to submit plaintiff to another examination by a psychiatrist.
 The question of a continuance addressed itself to the sound discretion of the District Judge. Although the accident occurred on January 3, 1962, the case was not brought to trial until January 10, 1968. Defendant had from December 15, 1967, to January 10, 1968, to discover the testimony of Dr. Breiner. We hold that the District Judge did not abuse his discretion in denying the motion for a continuance. Glawe v. Rulon, 284 F.2d 495 (C.A.8, 1960).
 2. The second assignment of error relates to the exclusion of correspondence by Dr. John Webster, a neurologist who examined Mrs. Pingatore after a referral from Dr. Kasabach, an ear specialist. Proposed Exhibit 45 (microfilm) and 45a (reproduction of microfilm) were of six letters. Proposed Exhibit 46 does not appear in the record, but it contained Dr. Kasabach's copy of Dr. Webster's letter. Dr. Webster was incapacitated, and Dr. Kasabach was dead at the time of the trial. In one letter, Dr. Webster gave a medical history of plaintiff and recommended hospitalization for testing. A second letter summarized the results of the testing. Defendant's counsel read selected parts from the hospital records where the testing was conducted. Since these records were the raw data in Dr. Webster's letters, the claimed error was harmless. 28 U.S.C. § 1732; Glawe v. Rulon, supra.
 3. Ten errors are assigned to the charge which, as supplemented, contains some forty-six pages. We do not deem it necessary to consider each assignment separately. Although some portions were repetitious, we find no prejudicial error in the charge.
 4. Defendant further contends that the District Judge made erroneous rulings which separately or cumulatively created such an unfavorable atmosphere that Ward was denied a fair trial. Only two of these assignments require attention.
 (a) Mr. Pingatore testified over objection to the effect that Mrs. Pingatore stated that she was bitten by a rat and pointed out the place where she was bitten. This testimony was only competent on the question of notice of time and place of the accident.
 (b) The ruling of the District Judge in limiting Mrs. Pingatore's deposition to impeachment purposes was erroneous. Rule 26(d) (2) permits the deposition of a party to a suit to be used by an adverse party for any purpose at the trial, even though the party was present at the trial and testified orally. 4 Moore's Federal Practice, ¶ 26.29; Pfotzer v. Aqua Systems, Inc., 162 F.2d 779 (C.A. 2, 1947); Merchants Motor Freight, Inc. v. Downing, 227 F.2d 247 (C.A. 8, 1955). The error was harmless because the material matters developed in the deposition were covered by other evidence in the record.
 5. Many errors are assigned to the argument of plaintiffs' counsel, some of which appear to have merit. We recognize that the District Judge has wide discretion in ruling on objections to arguments and that ordinarily his discretion will not be disturbed unless abused. Hockaday v. Red Line, 85 U.S.App.D. C. 1, 174 F.2d 154 (1949).
 The affidavit of counsel for Ward relates to the conduct of plaintiffs' counsel in his closing argument to the jury, as follows:
 "1. When shouting the words `God' and `damit' and several other times he would bend over and slam the flat of his hand on the counsel table with great force and emphasis, which made a loud noise and aroused and excited the jury.
 "2. He placed an empty chair in front of the jury with the chair facing the jury and shouted `where is the corporation today?'
 "3. While shouting charges he pointed an accusing finger at the empty chair and at the attorney for Wards.
 "4. In a dramatic manner he ripped down from the blackboards, crumpled up and threw on the table behind the blackboards four large sheets of paper, each 36" × 28", taped there with scotch tape by Wards' attorney during the closing argument of Wards' attorney, which four large sheets of paper contained a brief chronological medical history, in large hand printed letters, of plaintiff * * *"
 Affiant further stated that Juror No. 3 "was crying during the last part of Mr. Weinstein's closing rebuttal argument."
 It is obvious that the foregoing argument was extremely intemperate. Curse words have no place in the courtroom. Reference to Ward as a corporation and a large organization and placing a chair facing the jury and shouting "Where is the corporation today?" was calculated to prejudice the minds of the jury against Ward. Tearing sheets of paper used by opposing counsel in argument and crumpling them while dramatically saying "lies" was deplorable. Counsel's duty is to keep his argument within proper bounds. Palmer v. Miller, 145 F.2d 926, 932 (C.A. 8, 1944).
 The Supreme Court has not tolerated such conduct. In the words of Mr. Justice Stone:
 "Such a bitter and passionate attack on petitioner's conduct of the case, under circumstances tending to stir the resentment and arouse the prejudice of the jury, should have been promptly suppressed. See Masterson v. Chicago & N. W. Ry. Co., 102 Wis. 571, 574, 78 N.W. 757; Gulf, Colorado & S. F. Ry. Co. v. Butcher, 83 Tex. 309, 316, 18 S.W. 583; Tucker v. Henniker, supra [41 N.H. 317], at 322; Monroe v. Chicago & Alton R.R. Co., 297 Mo. 633, 644, 249 S.W. 644, 257 S.W. 469. The failure of the trial judge to sustain petitioner's objection or otherwise to make certain that the jury would disregard the appeal, could only have left them with the impression that they might properly be influenced by it in rendering their verdict, and thus its prejudicial effect was enhanced. See Hall v. United States, 150 U.S. 76, 81, 14 S.Ct. 22, (37 L.Ed. 1003); Graves v. United States, 150 U.S. 118, 121, 14 S.Ct. 40, (37 L.Ed. 1021); Wilson v. United States, 149 U.S. 60, 68, 13 S.Ct. 765, (37 L.Ed. 650). That the quoted remarks of respondents' counsel so plainly tended to excite prejudice as to be ground for reversal, is, we think not open to argument. The judgments must be reversed, with instructions to grant a new trial." N.Y. Central R.R. Co. v. Johnson, 279 U.S. 310, 318, 49 S.Ct. 300, 303, 73 L.Ed. 706 (1929).
 In the case of Brown v. Walter, 62 F. 2d 798 (C.A.2, 1933), Judge Learned Hand, in reversing the trial court for permitting improper argument of counsel for plaintiff, said in part:
 "* * * He argued with much warmth that the whole defence had been fabricated by the insurer — transparently veiled by such provocative phrases as an `unseen hand,' and an `unseen force,' and the like. This had not the slightest support in the evidence; it was unfair to the last degree. Nobody can read the summation without being satisfied that the real issues were being suppressed, and the picture substituted of an alien and malevolent corporation, lurking in the background and contriving a perjurious defence. A judge, at least in a federal court, is more than a moderator; he is affirmatively charged with securing a fair trial, and he must intervene sua sponte to that end, when necessary. It is not always enough that the other side does not protest; often the protest will only serve to emphasize the evil. Justice does not depend upon legal dialectics so much as upon the atmosphere of the courtroom, and that in the end depends primarily upon the judge." pp. 799, 800.
 
 
 1
 See: London Guarantee & Accident Co. v. Woelfle, 83 F.2d 325 (C.A.8, 1936); Chicago & N.W. Ry. Co. v. Kelly, 84 F.2d 569 (C.A.8, 1936).
 
 
 2
 The jury found in favor of Woolworth Company, thus finding that Woolworth did not violate any duty owed to the plaintiffs. The jury found that Ward did violate a duty owed to the plaintiff. Both Ward and Woolworth were charged as joint tortfeasors. The only claim that Ward would have against Woolworth would be for contribution. There is no claim for indemnity. The jury freed Woolworth from any obligation to pay contribution. The District Judge did not commit reversible error in dismissing Ward's cross-claim.
 
 
 3
 There is substantial evidence to support the verdict of the jury on the question of liability, and this phase of the case is affirmed.
 
 
 4
 Due to the intemperate argument of counsel for plaintiffs, the case is reversed and remanded for a new trial solely on the issue of the amount of damages. Gasoline Products Co. v. Champlin Refining Co., 283 U.S. 494, 499, 51 S.Ct. 513, 75 L.Ed. 1188 (1931); Thompson v. Camp, 167 F.2d 733 (C.A.6, 1948); Annot., 85 A.L.R.2d 9 (1962). Another trial should not consume as much time since the issue of liability is eliminated.
 
 
 
 Notes:
 
 
 *
 Honorable Robert L. Taylor, Chief Judge, United States District Court for the Eastern District of Tennessee, sitting by designation