**Billy C. BROWNLEE, Jr., Plaintiff,**

v.

**UNITED FIDELITY LIFE INSURANCE COMPANY, Defendant.**

**Civ. A. No. H86–0129(R).**

United States District Court,
S.D. Mississippi,
Hattiesburg Division.

July 17, 1987.

Lawrence E. Abernathy, III, J. Ronald Parrish, Laurel, Miss., for plaintiff.

Joshua J. Wiener, Brunini, Grantham, Grower & Hewes, Jackson, Miss., for defendant.

## MEMORANDUM OPINION

DAN M. RUSSELL, Jr., District Judge.

This cause is presently before the Court on the Motions of United Fidelity Life Insurance Company (United Fidelity) for a Judgment Notwithstanding the Verdict or in the Alternative for a New Trial. For the reasons more fully set out herein, this Court is of the opinion that the Motion for a New Trial is well taken and should be granted.

This case was tried in Hattiesburg, Mississippi in May, 1987. This Court then submitted the issues of actual and punitive damages to the jury. The jury returned a verdict in the amount of $2,500.00 actual damages and $57,200.00 punitive damages. This Court entered judgment on the jury verdict on May 21, 1987. United Fidelity then filed alternative post-trial motions in accordance with Fed.R.Civ.P. 50(b), 54(d) and 59(a), within the time required pursuant to Rules 50 and 59. This Court is aware that United Fidelity's alternative Motion for New Trial requested a judgment in its favor as to punitive damages and a new trial only as to actual damages. However, this Court is of the opinion that in light of the multiple improper statements made in closing argument by plaintiff's counsel, a complete new trial on all issues is warranted.

When determining if a new trial is required, the Court must separate the damages and liability issues. *Edwards v. Sears, Roebuck and Company*, 512 F.2d

276 (5th Cir.1975). If it can be established that passion, prejudice, caprice, undue sympathy or arbitrariness tainted only the damage award and not the liability assessment, the proper response is a remittitur or a new trial addressed to damages alone. *Pingatore v. Montgomery Ward & Co.*, 419 F.2d 1138 (6th Cir.1969) cert. denied, 398 U.S. 928, 90 S.Ct. 1818, 26 L.Ed 90 (1970). However, where it appears "that the improper jury action, in reasonable probability, affected both the liability and damages issues, then a new trial as to both issues must be ordered." *Edwards*, 512 F.2d at 283.

■ ▪The propriety of an argument is a matter of federal trial procedure, *Byrd v. Blue Ridge Rural Electric Cooperative*, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958), and in a diversity case, subject to federal rather than state law. *Baron Tube Co. v. Transport Insurance Co.*, 365 F.2d 858 (5th Cir.1966) (en banc). Therefore, even if no objections were made by defense counsel, this Court has been advised that where the defendant's right to a fair trial has been prejudiced, the error must be corrected and a new trial provided. *Edwards*, 512 F.2d at 286.

■ The following is the closing argument of plaintiff's counsel in its entirety. The areas of argument that this Court considers improper are specifically underlined.

\*     \*     \*     \*     \*     \*

MR. ABERNATHY: He said they didn't reduce because they didn't have a policy. Ladies and gentlemen, if you believe they didn't have a policy they did one of two things, they either reduced it or they cancelled it. One of the two. And they had the policy. No question about that in my mind and I think in your mind too.

They sent this amendment after the policy was issued. You look at the amendment. It says this file will be closed 4/31. The policy was issued a full two weeks before that. That's why they put 4/31 on there. The policy was already in effect and they knew it.

They said, "We might be able to slide this in."

It is also interesting to note that this man now has two policies sold by the same agent, for $500 apiece, and the maximum coordination of benefits that he can receive under those two policies came from this man on the stand, Mr. Barry, he said $800.

You know, it is just one story when they sell it to you and it is another story when you try to collect it, and that's the truth of insurance. That's the truth of this case right here.

You know, this morning at 2:30 I woke up and I hadn't been able to go back to sleep thinking about it—I have been talking to you you-all, you know, I know you haven't heard me but I have been talking to you-all, walking through the house and all and it just occurs to me that you folks have been called for jury duty since April 10th, of 1986. That's over a year, and some of you have been able to sit on cases and some of you haven't and the cases that you sat on, more than likely, if they weren't criminal matters, really—they were money disputes and it really didn't much matter to you, for sure, but to anybody other than the people involved. They didn't have any effect on the public in general. They didn't have any effect on the law as it will be interpreted in the future. It just wouldn't change anything. Your vote in those cases may or may not have been very important.

I kind of wonder when I go to vote, and I vote every time. Some guy wins and I'll go look at the tally on the T.V. that night and you know, some guy wins by a tremendous margin and I wonder, "What did my vote count?" You know? If I hadn't even voted, would it have mattered?

I am sure you wonder in these kind of cases, "What does it mean?" You know? It is just a dispute. This guy wants some money and the insurance company don't want to pay it. You know, a big deal.

But folks, I thought about it and it dawned on me, way before dawn, that this Bruce Barry came in here, he is not paid by this insurance company, he is not paid by this defendant, the lawyers. You heard what he said, "Well, I work for a subsidi-

ary or two or three subsidiaries and we work for North American," and I don't remember all the insurance companies he named, but it is the entire insurance industry.

That's what we are talking about. Billy Brownlee doesn't matter. That's what I thought this morning. This insurance company doesn't matter. That's not what this case is about. And it just hit me like a ton of bricks.

They sent this man in here, the industry. Of course, he testified he wasn't an expert, but he was the president of the company and all this here. The industry is looking at this case. They want to know what it takes, what can they do, they can put these things in their brochures and they can tell you point blank, "We are not going to do this. We are not going to cancel you. You can renew this policy until you are 65 years old." All this glorious language. You see it on T.V. I'll bet you saw it this morning. "No physical exam."

You-all, that's what they want to know. They want to know how far they can take it. How much can they tell you until they say, "Yeah, that's what it says. It says $1,000 on there but that ain't what it means. We got these underwriting guidelines and all this other kind of stuff that we are going to refer to if you ever submit a claim," and you had better believe if Billy Brown ever submits another claim—I hope he never breaks his neck again—but if he ever submits another claim they are going to say, "Ha! we have got this coordination of benefits. We are going to reduce it." You know. "Gosh, we didn't know about all this other stuff, but look a-here, we have got all these guidelines that we refer to." And that's it, ladies and gentlemen. They want to know how far they can go. How much can they advertise. How much can they tell us and then say, "That's what it says, but that ain't what it means."

Your verdict today—your vote today is important. You will never in your life have a more important vote—maybe if you are President of the United States you might. Maybe a United States Senator, but your vote today is going to set the practice and the policies and the procedures, not for this company—not only for this company, but all of these companies that this man was working for. This man is representing these companies right here.

You are going to tell them what they are going to do. You are going to send them a message, just like he says. The Judge said, you know, you weren't going to see any advertisement and this kind of thing, and at that point I think the Judge was telling you the absolute truth, but now I have changed my mind. The Judge didn't materially misrepresent anything, Your Honor, but circumstances in my mind have changed. I think you will see something on this case. I think you will see a change in the advertising on T.V. I think you will see a change. It is going to be up to you.

This is South Mississippi. I am a sole practitioner. Ronnie is a sole practitioner. We are a couple of little "jerk-water" lawyers out of Laurel, Mississippi. We don't represent the most prestigious firm in the State of Mississippi, the Brunini firm. We don't get high-dollar money. That insurance industry knows that and they are willing to come down here and for $2,500 fight us tooth and nail.

Both sides have spent more than $2,500. Why—why push it this hard? Because the insurance industry wants to know.

It is just like a criminal. A criminal wants to know the law. He wants to know how far he can take it, and I'll tell you, most criminals know the law better than the lawyers that represent them, but they want to know how far they can take it and it is just the difference in crime in the streets and crime in the suites.

A man takes a pistol out of his pocket and sticks it to the man's ear and says, "Give me the money." He is caught and convicted and he goes to prison.

The same thing with an insured. If he tries to defraud that insurance company, he makes a false claim, he is caught, he is convicted, Parchman is full of people that have tried to make false claims against

insurance companies and they are there. That's crime in the streets.

What about the man in the three-piece vest suit with a tie, holding that contract just like a weapon against his own insured? You remember him? That's the one they promised to protect. The one he took the money from.

What's the difference? What happens to that corporation? "Zip" Well, wait a minute. If they are caught and they are, so to speak, convicted, then they show a little less profit on their profit and loss statement, their financial statement for the year, and that's it, ladies and gentlemen.

A corporation is created by man. It ain't got no heart thumping in its big hairy chest. He hasn't got no soul worried about getting to Heaven. It ain't worried about Hell itself.

Ladies and gentlemen, the only thing a corporation can fear is you people. You are the only safeguard for Billy Brownlee.

Now, that corporation is created by man to do one thing and that's make money, and as long as that corporation is making money it will stay on that track headed toward the dollar and it has automatic safeguards built in to insure that it makes money.

When it fails to make money going in a certain direction, it has automatic safeguards built in to make it change directions and that's what we want. We want you to tell this insurance industry, "Change directions. Please, when you tell you are going to do it in this brochure, that's what we rely on." You change their direction. You can do it. You have an awesome power in your hands. Your vote is so important you are going to be the chairman of the board, I can see it.

If you bring back the right verdict, I can see in these towers in New York, these towers in Chicago and Nebraska, Kansas, everywhere—Texas—the chairman of the board will punch that microphone and he is going to say, "I want to see every disability claim we have pending right now." And they are going to load them up in the grocery carts and they are going to haul them in there. Why? "Because in South Mississippi yesterday they brought back a whopping punitive damage verdict against an insurance company that is doing the same thing that we are doing and if we get caught doing it they are going to punish us too. Now, if we owe one of our claimants $50, pay him. If we owe him $500, pay him. Get out there and investigate those claims. If those people are disabled and we told them we would do it in that brochure, pay them. If they are not disabled, deny their claim."

That's fair. But if you say you are going to do it in that brochure, you take the money, you have no right to come back and say, "Well, you know, yeah. That's what it says, but that ain't what it means."

You talk about a message? You are going to send them a message today. One of two messages you are going to send today. You are either going to tell that insurance industry—this insurance company in particular—that "We think you did the right thing here and we would encourage you to go on and flower up your advertising a little bit more. You are not going to follow it anyway. Say whatever you want to say. You are not going to do anything." Here, I think you-all did a fine job, you-all just run your merry way and I hope that none of your family ever, anybody—I hope nobody ever gets disabled—but anyway—or you can send this other message. This message that I want sent, Billy Brownlee wants sent, and everybody that has insurance, I believe, wants sent. "If you tell us you are going to do it in the brochure, do it. If you are going to do something else, tell us. That's all we want to know. We want a fair shot. When we take out that contract, we want to know what's covered. If it is not covered, tell us right there. When you sit on our couch and drink our coffee, tell us what's happening. Don't come back later, years later when there is no way to reinsure yourself and you have a broken neck. Nobody is going to insure you then. And then you say, 'Gee, well, you know, we have these guidelines.'"

Now, what I want to do is have you bring back—send them that message. This is their financial statement. We had a tremendous time getting this into evidence. Here it is and like the Judge said, he don't understand it, I don't understand it and I don't think you will understand it. This is a complicated document but it don't much matter. I just want you to look at a couple of figures on here. As you know, on a financial statement there are assets and liabilities. Liability—the liability of this company is 131 million, 652 thousand, 257 dollars. Do you know what that liability represents? It says right at the top of page 3, it represents, if I can see it, an aggregate reserve of life policies on contract. That's every policy that they have. If they sold 10 thousand here, 5 thousand there or 15 thousand here, that is taking all of those policies together, you might say, and put them in a reserve and they draw interest on that reserve daily at the highest rate allowed by law, and ladies and gentlemen, if they have 10% that they draw on that reserve, what they call a liability, let me show you what 10% for a year is, that's —excuse me, that's over a million dollars a year earned out of these policies, but everybody stipulated to one thing, when you look at this and ask them how much income tax they paid last year? That's on there. Sure it is. Let's look at how much they paid in income tax. How much did they pay? Zero.[1]

If you paid any, you paid more insurance than—you paid more income tax than this insurance company did and we all agree, on the last page, page 4, line 47, that is the financial worth, about the middle of the page, and it is awfully hard to read, but it is 28 million, 691 thousand, 025 dollars. That's the net worth of the company.

Now, ladies and gentlemen, they don't mind trying this case in South Mississippi because they know we can't figure out how much a million dollars is, I couldn't tell you how high a stack of $100 bills or $1.00 bills would be to a million dollars.

I know what real money is. I know what a $10 bill is. I can hold it in my hand. I know what a twenty and a ten is. I know what a hundred dollar bill is sometimes. That's real money, but how many times would you have to divide 28 million dollars before it is real money? I don't know. But that's the basis.

Now, this net profit. This is after they have paid their bills, after they have paid for cars and after they have paid for their trips to Hawaii and after they have paid all the salaries, and everything that they can pay and putting everything in reserve.

Billy Brownlee's file—his claim represents somewhere in this reserve. Not very much there. I think that little reserve there is only about 50 million or so, I am not sure.

But anyway, I am going to ask you to bring back enough money, at your sole discretion, to get the attention of this company to encourage it not to do these kind of things, but to get the attention of the entire insurance industry, more particularly the folks that paid his salary to come down here and sit and testify to you folks. I don't know what that would be. That's at your sole discretion. How much will it take to get their attention? I don't know. I have no earthly idea.

Maybe you want them to pay 10% of their net worth like a tithe or something like that? I don't know, how much is that? That's 286 thousand. That would be fair? That would be fine with us, if it makes any difference. But the point is, if you think that's half enough, that's fine. If you think that's twice enough, I don't know.

If you think half a million is fine, it doesn't matter. No matter what you think is the right amount, in your mind, be able to say, "I did something about it. I can live with myself. I had something to do with the fact that you don't see those advertisements on T.V. any more—well, you see them on T.V. because they got plenty

---

**1.** The Court notes from the record that counsel failed to inform the jury concerning the defend-  ant's operating losses for the previous year.

of money to advertise, but they are not going to be all this gross and abusive stuff, these ridiculous things, promises that you know they can't provide.

That's what we are after, you-all. If they tell us they are going to do it, let them do it.

Now, I don't know how much it will take. You decide. If you think half a million will do it, fine, that don't matter. If you think—whatever you think.

O.K. Now, before you bring back that figure, or any figure—I'm not telling you what to bring back, that's your sole discretion—we are looking for $2,500 on the contract. That's what they promised to pay. I know, they got all these guidelines and all this kind of stuff, but that's what needs to be prevented. That's what you folks can do, and then if you think this system needs correcting, you tell them. We want it corrected. You send that message.

If you think the system is fine, if you think they ought to be able to advertise and not produce, you send them that message too. Don't give any punitive damages.

That's the whole case right there, ladies and gentlemen.

That's what it rides on.

If you think they promised to pay Billy Brownlee, they issued that policy and then they voided it—I want you to look at this page right here. To me it looks a lot older than the one they got the "25" on top of. You might notice that it is the same policy number, you know.

They said they issued them consecutively.

They no more issued another policy than the man in the moon. Billy Brownlee never received it. The agent never received it. There is no transmittal letter to say that anybody ever received another policy.

They just voided this one. That's what they promised not to do. They reduced his benefits. That's what they promised not to do. And that's the message we need to send them.

"You tell us you won't do those things, don't do them."

What will it take? What kind of message do you want them to have.

Do you want them to have the one that says, "Look, boys, we think you did a fine job. We want you to continue to advertise like this."

Or do you want to say, "Well, enough is enough. Here is how the folks in South Mississippi react to it. This is what we think. We can figure out what your financial statement says. We don't have any problem adding and subtracting. Yeah, maybe we don't have the best school system in the nation, but we can sure figure up money."

That's what we want you to do, ladies and gentlemen. We want you to come back with a message, just like he said, a message, and you will know whether it was effective or not. You will know if your message was in the right amount.

It is up to you. Thank you very much.

     \*     \*     \*     \*     \*     \*

As noted earlier, the defendant made alternative post-trial motions for J.N.O.V. or a New Trial, limited to determining liability for actual damages. This Court will not grant the J.N.O.V. primarily because it was probable that the jury could have decided the issues of liability and damages (both actual and punitive) in either party's favor. With respect to granting the Motion for a New Trial, this Court is persuaded that the improper argument of plaintiff's counsel permeated and infected not only the issue of damages, but liability as well. Therefore, the Court has no choice but to grant a complete new trial. *Westbrook v. General Tire and Rubber Co.*, 754 F.2d 1233 (5th Cir.1985).

There has been some comment by plaintiff's counsel that this decision may give rise to a new "trial tactic" for defense attorneys. However, plaintiff's counsel should keep in mind that the success of closing argument is not measured by how many improper remarks one can get away with, before being objected to. In an effort to allow the attorneys the opportunity

to try their case, this Court does not ordinarily verbally indicate to either counsel that an objection was called for or that a statement was improper. However, in this case, the Court's preference was taken by plaintiff's counsel to mean ambivalence. Even though defense counsel made no objection during closing argument, this Court is unable to conclude that such was an intentional "trial tactic". Either through mistake or inadvertence, plaintiff's counsel was allowed to continue unimpeded. Because he chose to inflame the jury, rather than inform it, a complete new trial is the only adequate remedy.

Therefore, based on the conclusions set forth herein, this Court is of the opinion that a complete new trial should be granted.