# IN THE SUPREME COURT, STATE OF WYOMING

## 2019 WY _____

APRIL TERM, A.D. 2019

TRAVIS BOGARD,

**Appellant**
**(Defendant),**

v.                                                                S-18-0069

THE STATE OF WYOMING,

**Appellee**
**(Plaintiff).**

*Appeal from the District Court of Albany County*
*The Honorable Tori R.A. Kricken, Judge*

*Representing Appellant:*
    Thomas A. Fleener & Megan L. Hayes, Laramie, Wyoming.  Argument by Ms. Hayes.

*Representing Appellee:*
    Peter K. Michael, Wyoming Attorney General; Christyne M. Martens, Deputy Attorney General; Russell W. Farr, Senior Assistant Attorney General; Caitlin F. Harper, Senior Assistant Attorney General.  Argument by Mr. Farr.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**BOOMGAARDEN, J., delivers the opinion of the court; DAVIS, C.J., files a specially concurring opinion; KAUTZ, J., files a dissenting opinion.**

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BOOMGAARDEN**, Justice.

[¶1]    A jury found Travis Bogard guilty of sexual assault in the first degree and not guilty of kidnapping.  He appeals his conviction, raising five issues, including a claim that cumulative error deprived him of a fair trial.  Finding cumulative error resulting from prosecutorial misconduct, we reverse and remand for a new trial.

## ISSUES

[¶2]    Our disposition of Mr. Bogard's appeal turns on the analysis of two issues:

>    I.    Did the prosecutors commit misconduct?
>
>    II.    Did cumulative error deprive Mr. Bogard of a fair trial?

## FACTS

[¶3]    On October 28, 2016, the Friday night before Halloween, SK, a student at the University of Wyoming, put on a costume and went to a barbeque in Laramie, Wyoming.  After the barbeque, SK visited several bars in downtown Laramie with various friends, ultimately arriving at the Ranger with two friends around 1:45 or 2:00 a.m.  At the Ranger, another friend of SK's introduced her to Mr. Bogard and they immediately hit it off.  They talked, flirted, took a shot of tequila together, and consensually kissed.

[¶4]    SK and Mr. Bogard recall various details about what happened next differently.  By SK's account, Mr. Bogard then invited her to an "employee after party" and offered to show her its location.  When she told him that she wanted to get her friends first, he said that she could come back and get them if they wanted to go to the party.  By Mr. Bogard's account, he never used the phrase "after party."  Instead, he asked SK if she wanted to play pool with some people at the bar after it closed.  Given how well they were getting along, he then asked her if she wanted to go somewhere to be alone.  She expressed apprehension about going with him because she was worried that her friends might leave the bar without her.  When Mr. Bogard assured her that he would get her home if they did, she agreed to go with him.

[¶5]    It is undisputed that around 2:15 a.m., SK willingly followed Mr. Bogard down a lighted hallway that was covered in trash bags and Halloween decorations and then down another hallway that was unlit.  Mr. Bogard was familiar with the area because he had previously worked at the Ranger.  He led her by the hand into a bathroom and she willingly followed him inside.  They were consensually kissing as they entered.

[¶6]    SK's and Mr. Bogard's accounts of what happened in the bathroom between approximately 2:15 and 2:30 a.m. significantly differ.  By SK's account, Mr. Bogard turned

1

off the bathroom light, closed the door, and locked it. He picked her up and put her on a ledge behind the door, where they continued to consensually kiss. Then he took her purse off and put it in the sink. When he did so, SK felt scared, she did not know what was happening, and she told him that she wanted to go back to her friends. Mr. Bogard did not say anything in response. He picked her up by the waist and moved her over to the window. When he grabbed her, she tried to apply a pressure point to his shoulder. She also tried to get out of the bathroom, using her foot to try to twist open the doorknob. But she gave up trying to fight Mr. Bogard off after he moved her over to the window because she was scared that he would hurt her.

[¶7]    According to SK, at the window, Mr. Bogard pulled off her clothes and tried to penetrate her from behind. When he did so, she flinched and kept telling him that she wanted to go back to her friends. He did not say anything in response. Next, he moved her over by the bathtub, tried to penetrate her from behind, and put his penis in her vagina. Again, she told him that she wanted to go back to her friends and stated that she did not want to be there. He did not say anything in response. He tried to penetrate her again and then yelled at her that she was "too f[***]ing tight," yelled "what the f[***]," laughed, and left. After Mr. Bogard left the bathroom, SK put on her clothes and went to find her friends.

[¶8]    By Mr. Bogard's account, as they entered the bathroom, he turned off the bathroom light and closed, but did not lock, the door. He and SK proceeded to the back wall, where they continued kissing and he lifted up her sports bra. Then he guided her to the edge of the bathtub where he pulled down his jeans and boxers, as well as her costume. When he pulled off her costume, SK did not say anything. She had her hands on the bathtub and she was bent over it. When he accidentally attempted to penetrate her anally instead of vaginally, "[s]he pulled away violently" but did not say anything. When she pulled away, it startled him. He looked down and asked her, "Really? Are you okay?" but she did not say anything in response. He thought she pulled away because he had accidentally attempted to penetrate her anally, which he assumed was not what she wanted him to do and which was not what he intended to do. He again attempted to penetrate her vaginally and did so slightly, guiding his penis with his thumb. When he did so, she "pulled away just as violently" and he considered that his rejection. He pulled up his clothing, told her to take her time, and left the bathroom.

[¶9]    According to Mr. Bogard, on his way out of the bar, he told the bartender that he had been rejected and "potentially" made a comment about giving SK a "slow clap." Then Mr. Bogard went outside and forced himself to vomit because he had been mixing alcohol that night and felt sick.

[¶10]  What happened after Mr. Bogard and SK left the bar is generally undisputed. After SK left the bar at approximately 2:32 a.m., she located her friends, told them that she had just been raped, and one of them called 911. SK told the 911 operator that the assailant, a bartender at the Ranger, told her to come with him and took her to a bathroom. A friend

drove SK to the hospital where a Sexual Assault Nurse Examiner (SANE) examined her and collected evidence. SK also provided a written statement to the police. After Mr. Bogard left the bar, he returned to Cheyenne, where he was eventually arrested.

[¶11] In November 2016, the State charged Mr. Bogard with one count of sexual assault in the first degree, in violation of Wyoming Statute § 6-2-302(a)(i), and one count of kidnapping, in violation of Wyoming Statute § 6-2-201(a)(ii).[1] The case proceeded to a five-day trial in June 2017, at which Mr. Bogard testified in his own defense. The jury was unable to reach a unanimous verdict and the court declared a mistrial. The State immediately filed notice of its intent to retry Mr. Bogard on the same charges.

[¶12] In October 2017, the case proceeded to another five-day trial. Although Mr. Bogard exercised his right not to testify at this trial, the State read the transcript of his testimony from the first trial into the record, over his objection. SK testified at length and defense counsel cross-examined her about inconsistencies in her testimony on direct examination compared to her previous testimony and statements about the assault. Also relevant to this opinion, Candace Burch, a SANE nurse, discussed her examination of SK at the hospital, including SK's external and internal injuries. Kimberly Ley, a forensic analyst in the biology unit at the Wyoming State Crime Lab, testified about DNA testing results from the vaginal and anal swabs that the SANE nurse collected. Ms. K, a witness unrelated to SK, discussed her dating relationship with Mr. Bogard before the assault and her interaction with him at the bar and via text message the night of the assault. Cactus Aanenson, the bartender at the Ranger the night of the assault, discussed what Mr. Bogard said to him on Mr. Bogard's way out of the bar.

[¶13] On the second to last day of trial, the State called an expert, Dr. Matthew Gray, to discuss trauma and memory. The defense called its own expert, Dr. Thomas Kirk, to counter Dr. Gray's testimony. In closing and rebuttal argument, the prosecutors and defense counsel disputed when SK withdrew consent and challenged SK's and Mr. Bogard's credibility, respectively.

[¶14] The jury found Mr. Bogard guilty of sexual assault in the first degree and not guilty of kidnapping. The district court sentenced him to five to ten years of imprisonment.

---

[1] The relevant portion of the first degree sexual assault statute provides: "(a) Any actor who inflicts sexual intrusion on a victim commits a sexual assault in the first degree if: (i) The actor causes submission of the victim through the actual application, reasonably calculated to cause submission of the victim, of physical force or forcible confinement[.]" Wyo. Stat. Ann. § 6-2-302(a)(i) (LexisNexis 2016). The relevant portion of the kidnapping statute provides: "(a) A person is guilty of kidnapping if he unlawfully removes another from his place of residence or business or from the vicinity where he was at the time of the removal, or if he unlawfully confines another person, with the intent to: (ii) Facilitate the commission of a felony[.]" Wyo. Stat. Ann. § 6-2-201(a)(ii) (LexisNexis 2016).

[¶15] We discuss additional facts and proceedings below as necessary.

## *DISCUSSION*

### I.    *Did the prosecutors commit misconduct?*[2]

[¶16] Mr. Bogard contends that the prosecutors committed numerous instances of misconduct. "Prosecutorial misconduct is '[a] prosecutor's improper or illegal act (or failure to act), [especially] involving an attempt to persuade the jury to wrongly convict a defendant or assess an unjustified punishment.'" *Dixon v. State*, 2019 WY 37, ¶ 37, 438 P.3d 216, 231 (Wyo. 2019) (quoting *Craft v. State*, 2013 WY 41, ¶ 13, 298 P.3d 825, 829 (Wyo. 2013)). Mr. Bogard "bears the burden of establishing prosecutorial misconduct." *Id.* ¶ 41, 438 P.3d at 231 (citing *Condra v. State*, 2004 WY 131, ¶ 5, 100 P.3d 386, 389 (Wyo. 2004)).

[¶17] Some instances of alleged misconduct occurred during the State's case-in-chief. The remaining instances of alleged misconduct occurred during the State's closing and rebuttal arguments. Because defense counsel objected to some of the alleged errors, but did not object to the remaining alleged errors, two different standards of review apply.

[¶18] We apply the harmless error standard to those statements to which Mr. Bogard objected, recognizing that we must find there was an error before we consider whether an error was harmless. *Black v. State*, 2017 WY 135, ¶ 13, 405 P.3d 1045, 1050 (Wyo. 2017); *King v. State*, 2018 WY 52, ¶ 11, 417 P.3d 657, 660 (Wyo. 2018) (citing *Gonzalez–Ochoa v. State*, 2014 WY 14, ¶ 15, 317 P.3d 599, 604 (Wyo. 2014)). We apply the plain error standard to those matters and statements to which Mr. Bogard did not object. *Black*, ¶ 13, 405 P.3d at 1050 (citation omitted). Under either standard, our ultimate focus and attention is on whether the alleged error affected Mr. Bogard's substantial right to a fair trial. *McGinn v. State*, 2015 WY 140, ¶ 13, 361 P.3d 295, 299 (Wyo. 2015); *Sam v. State*, 2017 WY 98, ¶ 65, 401 P.3d 834, 856 (Wyo. 2017), *reh'g denied* (Sept. 26, 2017), *cert. denied*, 138 S.Ct. 1988, 201 L.Ed.2d 248 (2018).

[¶19] In evaluating closing argument, we recognize that counsel is allowed wide latitude; the prosecutor may comment on all of the evidence and may suggest reasonable inferences from the evidence. *Teniente v. State*, 2007 WY 165, ¶ 30, 169 P.3d 512, 524 (Wyo. 2007). "We measure the propriety of closing arguments in the context of the entire argument and compare them with the evidence produced at trial." *Doherty v. State*, 2006 WY 39, ¶ 18, 131 P.3d 963, 969 (Wyo. 2006) (citation omitted).

---

[2] At trial, the County Attorney and the Deputy County Attorney represented the State. They divided examination of witnesses and presentation of closing and rebuttal argument. One instance of alleged prosecutorial misconduct is attributable to the County Attorney. The remaining instances of alleged prosecutorial misconduct are attributable to the Deputy County Attorney.

[¶20]   Instead of addressing the many alleged instances of prosecutorial misconduct in the order in which the parties present them, we address those matters for which we find no misconduct first, reordering them so that they are generally addressed in chronological order.   Then we address those matters for which we find prosecutorial misconduct, reserving any discussion of prejudice for our cumulative error analysis.[3]  *See Black*, ¶ 46 n.11, 405 P.3d at 1060 n.11 (explaining our decision to defer discussion of prejudice for our cumulative error analysis).

## A.   No Prosecutorial Misconduct

[¶21]  We review all but one of the following instances of alleged prosecutorial misconduct for plain error.   To establish plain error, Mr. Bogard "must show 1) the record clearly reflects the incident urged as error; 2) a violation of a clear and unequivocal rule of law; and 3) that he was materially prejudiced by the denial of a substantial right."  *Carroll v. State*, 2015 WY 87, ¶ 11, 352 P.3d 251, 255 (Wyo. 2015) (quoting *Masias v. State*, 2010 WY 81, ¶ 20, 233 P.3d 944, 950 (Wyo. 2010)).   Regarding the second requirement, Mr. Bogard must establish "a violation of a clear and unequivocal rule of law in a clear and obvious, not merely arguable, way[.]"  *Solis v. State*, 2013 WY 152, ¶ 39, 315 P.3d 622, 631 (Wyo. 2013) (quoting *Dennis v. State*, 2013 WY 67, ¶ 42, 302 P.3d 890, 899 (Wyo. 2013)).   Each of the following alleged errors we review for plain error are clearly reflected in the record, thus satisfying the first requirement.   We review the final instance of alleged prosecutorial misconduct in this section for harmless error.

### 1.   *Victim impact argument related to credibility.*

[¶22]  Mr. Bogard argues that the prosecutor made statements calculated to inflame, prejudice, and mislead the jury during closing argument by impermissibly attempting to "appeal to the jury's sympathy and passions for [SK]."

[¶23]  During closing argument, the prosecutor argued that SK's version of events had remained consistent, stating:

> Eight minutes.   It's unreasonable to think she made up that
> story and started sobbing to 911 for fun in eight minutes.   It's

---

[3] The harmless error standard would require that Mr. Bogard "show prejudice under circumstances which manifest inherent unfairness and injustice or conduct which offends the public sense of fair play." *Dysthe v. State*, 2003 WY 20, ¶ 10, 63 P.3d 875, 881 (Wyo. 2003) (citation & internal quotation marks omitted). Mr. Bogard asks us to shift the burden of proving harmless error from him to the State. *See McGinn*, ¶¶ 41–54, 361 P.3d at 304–08 (Fox, J., specially concurring) (arguing the burden of demonstrating harmless error from prosecutorial misconduct should be placed on the beneficiary of the error, the State, instead of the appellant).   We do not address Mr. Bogard's request because we analyze prejudice under the rubric of cumulative error, not the separate frameworks of harmless and plain error.

5

unreasonable to think that this statement made hours later to Officer McAlmond with almost identical facts is unreasonable. This is consistency. It's consistency that [SK] has been drug through the mud, drug up here, picked, prodded, poked, and abused, maintained consistency. With the SANE examiner, maintained consistency.

[¶24] A few moments later, the prosecutor provided the jury a timeline of events, noting that the 911 call occurred at 2:41 a.m. and that SK's interview with Officer McAlmond occurred at 2:50 a.m. He then implored the jury to "[l]ook at the evidence" and continued with the timeline, stating: "Meanwhile, as the night progresses, [SK] is being poked, prodded, examined, spread open, humiliated for all of us to see. No one wants that. No one asks for that. No one asks to be scraped, documented, biologically swabbed."

[¶25] Victim impact argument occurs when the prosecutor uses victim impact evidence[4] in closing argument or rebuttal argument. "[W]e have clearly stated that 'victim impact argument is inappropriate during the guilt phase of a criminal prosecution and prosecutors should not make arguments calculated to inflame the passions or prejudices of the jury.'" *Sam*, ¶ 63, 401 P.3d at 855 (quoting *Haynes v. State*, 2008 WY 75, ¶ 38, 186 P.3d 1204, 1213 (Wyo. 2008)). However, a prosecutor may refer to victim impact evidence in argument for a proper purpose, such as to bolster a witness's credibility after it is attacked. *See, e.g.*, *White v. State*, 2003 WY 163, ¶ 20, 80 P.3d 642, 651 (Wyo. 2003).

[¶26] We must analyze the prosecutor's argument in broad context when applying these rules. *Doherty*, ¶ 18, 131 P.3d at 969. Here, credibility was a central issue at trial and defense counsel drew the jury's attention to inconsistencies in SK's story on cross-examination. The prosecutor countered the attack by arguing that SK's story remained consistent throughout the timeline of events. In doing so, the prosecutor argued, albeit disjointedly, that it would have been unreasonable for SK to fabricate an allegation of assault, only to be subject to intrusive medical examinations and a public trial. Under these circumstances, Mr. Bogard has not established that the prosecutor violated the rule against improper victim impact argument in a clear and obvious way. Mr. Bogard therefore has not established plain error.

## 2. *Comment on Mr. Bogard's silence.*

[¶27] Mr. Bogard argues that the prosecutor made statements calculated to inflame, prejudice and mislead the jury during closing argument by twice mentioning his silence

---

[4] "Broadly speaking, victim impact evidence is that evidence relating to the victim's personal characteristics and to the physical, emotional, or social impact of a crime on its victim and the victim's family." *Smith v. State*, 2005 WY 113, ¶ 15, 119 P.3d 411, 416 (Wyo. 2005) (citations omitted).

and thereby vouching for the strength of the State's evidence against him. For the reasons stated below, we conclude that neither statement constitutes an improper comment.

[¶28] A prosecutor may not comment on a defendant's constitutional right to remain silent. *Lancaster v. State*, 2002 WY 45, ¶ 36, 43 P.3d 80, 95 (Wyo. 2002), *overruled on other grounds by Jones v. State*, 2019 WY 45, 439 P.3d 753 (Wyo. 2019). "The constitutional right to silence exists at all times—before arrest, at arrest, and after arrest[.]" *Tortolito v. State*, 901 P.2d 387, 390 (Wyo. 1995).

[¶29] "A prosecutor does not 'comment' on a defendant's exercise of his right to silence where he does not attempt to use the silence to the state's advantage, where he does not argue to the jury that the silence was evidence of guilt or an admission of guilt, and where the defendant does not show any prejudice." *Lancaster*, ¶ 39, 43 P.3d at 96 (citation omitted). Indeed, "[t]here are many situations where, without reversible error, evidence may be adduced that a defendant 'remained silent' at some point." *Id.* ¶ 38, 43 P.3d at 96 (citing *Shipman v. State*, 2001 WY 11, ¶ 5, 17 P.3d 34, 36 (Wyo. 2001) (officer testified that, at the murder scene, the defendant said he "did not want to say anything else"); *Robinson v. State*, 11 P.3d 361, 373 (Wyo. 2000) (prosecutor noted what the defendant "left out" when he made a statement to the police); *Beartusk v. State*, 6 P.3d 138, 144 (Wyo. 2000) (officer testified that, after answering some innocuous questions, the defendant indicated he did not wish to answer any more questions); and *Emerson v. State*, 988 P.2d 518, 522 (Wyo. 1999) (prosecutor noted facts the defendant did not include in his statements)).

[¶30] In reviewing statements alleged to violate the well-established rule, "[w]e consider the entire context in which the statements were made to decide whether there was an impermissible comment upon the defendant's exercise of his right of silence, and will not take sentences and phrases out of context." *Robinson*, 11 P.3d at 373 (citation omitted).

[¶31] During closing argument, the prosecutor stated:

> Travis Bogard vehemently denies, despite any corroboration of evidence, that he never said after party, yet he expects you to believe that [SK] 25 minutes after meeting him was willing to get bent over a tub in a bathroom in a motel in an isolated hallway away from her friends where she had no idea where she was going. That [SK] wanted to not say a single word as he shoved his penis inside of her. He deceived her into going down that hallway. Her testimony over and over and over and over again. **You don't have much of what the Defendant says and I'll touch on that later**.[5] Her testimony over and

---

[5] From our review of the record, the prosecutor did not revisit the issue later in his argument.

over and over is that she was led down that hallway through deceit, that she was fooled into thinking there was something down that hallway.

(Emphasis added.)

[¶32]  Later during closing argument, the prosecutor walked the jury through a timeline of events at the bar and leading up to Mr. Bogard's arrest.  In providing that timeline, the prosecutor stated:

> Victim provides that written statement to the police.  **You hear nothing from the Defendant**.  The Defendant is arrested for sexually assaulting [SK].

(Emphasis added.)

[¶33]  The prosecutor's statement that the jury did not "have much of what the Defendant says," viewed in isolation, could be construed as a comment on Mr. Bogard's decision not to testify at his second trial.  In context, however, the prosecutor was discussing SK's stated reason for following Mr. Bogard down the hallway to the bathroom versus the reason Mr. Bogard stated that she followed him.  SK testified that she left the bar area and followed Mr. Bogard because he invited her to an "after party" and offered to show her where it was located.  Through the State's introduction of Mr. Bogard's testimony from the first trial, Mr. Bogard maintained that he initially invited SK to "come hang out" and play pool after the bar closed.  He denied referring to it as an "after party."  By his account, he then asked SK whether she wanted to be alone and, after she expressed some initial hesitancy because she did not want her friends to leave the bar without her, she agreed to go with him.  The prosecutor's statement can be read as a comment on what was missing from Mr. Bogard's explanation, not a clear and obvious violation of the rule prohibiting comment on exercise of Mr. Bogard's right to remain silent.

[¶34]  If read in isolation, the prosecutor's statement that "[y]ou hear nothing from the Defendant" after the sexual assault could be construed as a comment on Mr. Bogard's exercise of his right to remain silent before his arrest.  But viewed in context, it more logically references the gap in time in which no one heard from Mr. Bogard after the alleged assault and during which, by Mr. Bogard's account, he was asleep.  At trial, the State presented evidence that after Mr. Bogard left the bar, he returned to Cheyenne and no one heard from him again until the next afternoon.  In Mr. Bogard's testimony from the first trial as read to the jury, Mr. Bogard stated that shortly after he woke up at 1:30 p.m. the afternoon after the alleged assault, he noticed that he "had a ton of missed calls and a ton of texts" "[f]rom everybody," including police officers, and he began returning those calls.  Because the prosecutor's comment in no way references an instance in which Mr.

8

Bogard exercised his right to remain silent after the alleged sexual assault and before his arrest, it follows that the prosecutor did not violate a clear and unequivocal rule of law.

[¶35] Mr. Bogard has not established that the prosecutor violated a clear and unequivocal rule of law in a clear and obvious, not merely arguable, way with either statement. Consequently, he has not established plain error as to either statement.[6]

### 3. *Comments regarding defense counsel.*

[¶36] Mr. Bogard argues that the prosecutor made statements calculated to inflame, prejudice and mislead the jury during closing argument by personally attacking defense counsel for berating the victim when she was on the witness stand.

[¶37] As previously noted, the prosecutor walked the jury through a timeline of events during closing argument and, in doing so, stated:

> Let's talk about what happened, what we know happened. From 1:30 to 1:45, **regardless of the hours of nitpicking Defense Counsel's [sic] attempted to confuse and belittle the issue**. At some point in time after 1:00 o'clock, after not drinking, after being with her sorority sisters, [SK] arrives at the Ranger bar.

(Emphasis added.)

[¶38] "It is prosecutorial misconduct to 'launch personal attacks against defense counsel to inflame the passions and prejudices of the jury.'" *Hamilton v. State*, 2017 WY 72, ¶ 14, 396 P.3d 1009, 1014 (Wyo. 2017) (citation omitted). There is a distinction, however, between launching personal attacks against defense counsel and remarking on the defense's case. *Hamilton* illustrates that distinction. A jury found Mr. Hamilton "guilty of five counts of sexual assault and sexual abuse of a minor." *Id.* ¶ 1, 396 P.3d at 1010. He appealed his conviction, arguing that two or more instances of prosecutorial misconduct amounted to cumulative error. *Id.* ¶¶ 1–2, 396 P.3d at 1010–11. Among other issues, he argued that the prosecutor "repeatedly … ridiculed the defense." *Id.* ¶ 13, 396 P.3d at 1013. The prosecutor stated that the defense dragged one of the victims through the mud. *Id.* The prosecutor also stated that defense counsel's arguments were "not reasonable," "absurd," "fundamentally ridiculous," "so off-the-wall ridiculous it's beyond belief," "nonsense," and "a very bizarre, out-there explanation." *Id.* ¶¶ 13–14, 396 P.3d at 1013–14. We concluded that the statements, "[t]hough ill-advised," "related to the prosecution's

---

[6] To the extent Mr. Bogard separately asserts that the prosecutor vouched for the strength of the State's case against him with either statement, he does not set forth cogent argument and we decline to consider the matter. *Marshall v. State*, 2016 WY 119, ¶ 14, 385 P.3d 304, 308 (Wyo. 2016).

view of the defense's case" and did not amount to prosecutorial misconduct. *Id.* ¶ 14, 396 P.3d at 1014; *cf. Strickland v. State*, 2004 WY 91, ¶ 50, 94 P.3d 1034, 1054 (Wyo. 2004) (identifying as a personal attack on defense counsel the prosecutor's statement "[i]t is amazing a defense attorney who has never worked a scene, who has never investigated a fire can be an expert and disagree with the clear evidence of all the witnesses").

[¶39] On cross-examination of SK, defense counsel addressed a wide range of inconsistencies, some of which may have seemed minor, like whether she arrived at the Ranger at 1:45 or 2:00 a.m. and which door she exited through when she left the bar. In light of such cross-examination and the record as a whole, the prosecutor's comments here, like those in *Hamilton*, constitute a remark on the defense's case, not a personal attack against defense counsel. Mr. Bogard established no plain error on this issue.

### 4.  *Argument regarding traumatic memory loss.*

[¶40]  Without much explanation or analysis, Mr. Bogard argues that the prosecutor made statements calculated to inflame, prejudice and mislead the jury during closing argument by claiming that SK "suffered from traumatic memory loss as a way to bolster her credibility after defense counsel revealed inconsistencies in her testimony, even though she had never been diagnosed with traumatic memory loss and instead said she suffered from anxiety and her memory blurred from 'panic attacks.'"

[¶41]  During closing argument, the prosecutor attempted to link Dr. Gray's testimony about traumatic memory loss to SK's inconsistent statements after the assault, arguing:

> [PROSECUTOR]: Remember Dr. Gray's testimony. Without having ever met the victim, having a single detail about this case or her specific situation, those are—the Defense makes it seem like that's not in his favor. We're not trying to corroborate [SK]. We're trying to show you that these issues, these complexities, these nuances to traumatic memory loss exist and they're explainable. They're not the result of [SK]— they're not the result of—excuse me, I apologize.
>
> Traumatic memory loss is a thing. It's a diagnosable, clinical researched and established corroborated and peer reviewed thing. It happens. Dr. Gray did not tell you it happened in this case, but it happened in this case, because [SK]—
>
> [DEFENSE COUNSEL]: Objection, it's not in evidence.
>
> THE COURT: Overruled.

10

[PROSECUTOR]: [SK] was diagnosed individually, independently with PTSD as a result of this. [SK] suffered from traumatic memory loss, and any inconsistencies which she has are not attempts by her, as she so eloquently put it, to deceive or lie to you. They are attempts by her to give you as much of the truth as she recalls.

[¶42] On cross-examination, SK testified that she suffers from and has received counseling for PTSD, adding that "it's hard to recall exact details of a trauma when you suffer from PTSD." The State's expert, Dr. Gray, subsequently testified about traumatic memory loss. In doing so, he addressed a common misconception that details regarding a horrific event that someone experiences should be "seared in" that person's memory. He explained that research is pretty clear and there is consensus that "trauma memory is often fairly spotty and gappy." Thus, while "people will remember some aspects of their trauma with pretty good clarity and in some degree of high detail," they may not retain "peripheral details" or other aspects of the sequence of events. He also addressed PTSD, explaining that "[o]ne of the qualifying symptoms of PTSD, one of 20 symptoms that could be met to meet diagnostic criteria of posttraumatic stress disorder is inability to recall important parts of the traumatic event." On cross-examination, he confirmed that he did not diagnose SK with PTSD, did not know whether she had any constructed memories, and did not know whether any of the matters he had addressed applied to the case.

[¶43] Mr. Bogard does not analyze the prosecutor's argument in light of SK's and Dr. Gray's testimony, acknowledge the prosecutor's express recognition that Dr. Gray did not testify that SK suffered from traumatic memory loss, address whether the prosecutor argued a reasonable inference from the evidence (e.g., that the inconsistencies in SK's story could be attributable to her PTSD because the symptoms of PTSD may include inability to recall important details), or provide analysis of how the prosecutor's argument regarding Dr. Gray's testimony was calculated to inflame, prejudice and mislead the jury. Mr. Bogard therefore has not established that the prosecutor violated any clear and unequivocal rule of law in a clear and obvious way and has failed to establish any plain error on this issue.

### 5. *Asking Dr. Gray a question regarding false reporting.*

[¶44] We review for harmless error Mr. Bogard's argument that the State impermissibly asked its expert a question that called for vouching.

[¶45] In testifying on direct examination about general matters related to trauma and memory, Dr. Gray defined a "sexual assault myth" as "a common belief that people might have that does not fit with the best available research." The prosecutor asked Dr. Gray the question at issue at the end of direct examination:

[PROSECUTOR]: I'm just going to ask the question. Is there a sexual assault myth related to the false reporting of sexual assault?

[DEFENSE COUNSEL]: Objection, Your Honor, vouching.

THE COURT: Sustained.

[PROSECUTOR]: Thought I'd give it a try, Your Honor.

THE COURT: Your valiant efforts.

[PROSECUTOR]: Nothing further.

[¶46]   Both parties recognize the general rule against vouching.  "[T]his Court, in a long line of decisions, has clearly and unambiguously held it is error for expert and lay witnesses alike to vouch for the credibility of the testimony of an alleged sexual assault victim." *Lopez v. State*, 2004 WY 103, ¶ 22, 98 P.3d 143, 150 (Wyo. 2004) (collecting cases). However, our vouching cases generally address whether a witness's answer constituted vouching, not whether a question called for vouching.  *See, e.g.*, *id.* ¶ 17, 98 P.3d at 148; *Sweet v. State*, 2010 WY 87, ¶ 10, 234 P.3d 1193, 1197–98 (Wyo. 2010).  Mr. Bogard does not address this nuance or any cases that specifically address expert testimony about false reporting myths in sexual assault cases.[7]   Although the district court sustained defense counsel's vouching objection, read narrowly, the prosecutor's question called for a simple "yes" or "no" answer.  In light of these considerations, we conclude that Mr. Bogard has not met his burden to establish error with respect to this instance of alleged prosecutorial misconduct.  *See Woods v. State*, 2017 WY 111, ¶ 18, 401 P.3d 962, 969 (Wyo. 2017) (citation omitted) (noting that we "will not frame the issues for the litigants and will not consider issues not raised by them and not supported by cogent argument and authoritative citation."); *King*, ¶ 11, 417 P.3d at 660 (citation omitted).

---

[7] In addressing sexual assault trials involving child victims, one treatise notes that "quantifications or percentages of truthful complainants or valid sexual assault complaints by experts are [] improper" because such testimony invades the province of the jury to determine witness credibility.  1 Paul DerOhannesian II, *Sexual Assault Trials* § 11.17 (4th ed. 2014) (collecting cases); *see also People v. Julian*, 34 Cal.App.5th 878, 886–87, 246 Cal.Rptr.3d 517, 523–24 (Cal. Ct. App. 2019), *as modified* (May 13, 2019) (setting forth a comprehensive survey of cases from other jurisdictions addressing testimony about the percentage of sexual assault victims who falsely report and finding those decisions persuasive).  While that is the view of the majority of the jurisdictions to have addressed the issue, other jurisdictions have reached the opposite conclusion when the statistical evidence has no link to the victim.  *See Alvarez-Madrigal v. State*, 71 N.E.3d 887, 890–93 (Ind. Ct. App. 2017); *State v. Harrison*, 340 P.3d 777, 779–81 (Ore. Ct. App. 2014); *State v. Morales-Pedrosa*, 879 N.W.2d 772, 777–80 (Wis. Ct. App. 2016).  We have yet to address this specific issue and will not do so here.

### B.    Prosecutorial Misconduct

[¶47]   In the following instances, we find prosecutorial misconduct but reserve discussion of prejudice for our cumulative error analysis.  *See Black*, ¶ 46 n.11, 405 P.3d at 1060 n.11.

### 1.    *The prosecutor violated the district court's W.R.E. 404(b) order.*

[¶48]   Mr. Bogard argues the prosecutor ignored the trial court's order denying the State's motion to admit evidence regarding his prior uncharged misconduct under W.R.E. 404(b). He contends the prosecutor violated the order when he called Ms. K—who went on a couple of dates with Mr. Bogard in the months leading up to the alleged assault on SK— and then repeatedly referred to Ms. K's "negative experience" with Mr. Bogard.

[¶49]   The State called Ms. K on the third day of trial to testify about her relationship with Mr. Bogard.  She testified that she met Mr. Bogard through a dating app and went on a couple of dates with him.  On their first date, she went to a bar with Mr. Bogard and he lifted her up "off the ground sporadically throughout the night" in what she considered a romantic gesture.[8]  When the State asked Ms. K why she stopped going on dates with Mr. Bogard, she responded that their last date, which consisted of dinner at his apartment, "was a negative experience" for her.  She confirmed that the "negative experience" made her disinterested in continuing her romantic involvement with Mr. Bogard.  The prosecutor subsequently referred to the "negative experience" several more times during Ms. K's direct examination.  The prosecutor did not elicit any details regarding what the "negative experience" entailed.

[¶50]   Ms. K testified that a couple of weeks after the "negative experience," Mr. Bogard asked her to go to dinner with him and a friend in Laramie on what turned out to be the night of the alleged assault, but Ms. K told him that she was busy.  Mr. Bogard said something to Ms. K in a text message about going to the Ranger bar that night and, as a result, Ms. K briefly went to the Ranger around 1:15 or 1:30 a.m. to show her friend what Mr. Bogard looked like.  When Ms. K went to the bar, she saw Mr. Bogard talking to one of the bartenders, she and Mr. Bogard waved, and then she immediately left.  Shortly after 2:00 a.m., Mr. Bogard texted her and she interpreted his text message to mean that he was mad at her for leaving the bar without speaking to him.

[¶51]   We routinely look to the *ABA Standards for Criminal Justice Prosecution Function and Defense Function* for guidance in prosecutorial misconduct cases.  *See, e.g.*, *Larkins v. State*, 2018 WY 122, ¶ 95, 429 P.3d 28, 50 (Wyo. 2018) (citation omitted) (closing

---

[8] Although the court initially sustained defense counsel's 404(b) objection to Ms. K's testimony about Mr. Bogard picking her up, it backtracked from that ruling after a sidebar in which the prosecutor explained that Ms. K was "not getting into any of the events of any sexual events of that night" and was instead expressing how she interpreted him being romantic.

argument); *Hill v. State*, 2016 WY 27, ¶ 53, 371 P.3d 553, 567 (Wyo. 2016) (citation omitted) (vouching); *McGill v. State*, 2015 WY 132, ¶ 20, 357 P.3d 1140, 1148 (Wyo. 2015) (citation omitted) (replying to defense counsel's argument). In *Wilde v. State*, we noted that "it is misconduct to deliberately ignore a trial court's liminal orders," citing the ABA standard which states that "[a] prosecutor should not knowingly and for the purpose of bringing inadmissible matter to the attention of the judge or jury offer inadmissible evidence, ask legally objectionable questions, or make other impermissible comments or arguments in the presence of the judge or jury."[9] *Wilde v. State*, 2003 WY 93, ¶ 27, 74 P.3d 699, 711 (Wyo. 2003) (citing *ABA Standards for Criminal Justice: Prosecution Function and Defense Function* § 3–5.6 (3rd ed. 1993)). In light of *Wilde* and the ABA standards, it is likewise misconduct for a prosecutor to ignore a trial court's W.R.E. 404(b) order and, thus, knowingly bring inadmissible evidence to the jury's attention. To determine whether the prosecutor ignored the district court's W.R.E. 404(b) order and knowingly brought inadmissible evidence to the jury's attention in this case, we must consider the court's pretrial rulings and the context in which the prosecutor offered Ms. K's testimony and then commented on the same.

[¶52] The court made two relevant rulings: one governing introduction of prior uncharged misconduct under W.R.E. 404(b), and one governing introduction of evidence more generally describing Mr. Bogard's relationship with Ms. K. The first pretrial ruling was precipitated by the State's motion to introduce evidence regarding Mr. Bogard's and Ms. K's sexual encounter at his apartment. The State summarized its proposed evidence as follows:

> **The State is seeking to offer evidence of a previous sexual encounter of the Defendant with [Ms. K] that occurred nine days prior to the acts charged in this case.** Defendant, after recently meeting both women [i.e., Ms. K and SK], and never having a sexual encounter with them previously, provided them with alcoholic beverages, convinced them to remain with him over their objections, and performed similar sexual acts upon them, in similar positions. The women were of similar age and physical appearance.

---

[9] The standard we cited in *Wilde* has been updated but remains substantively the same. *See ABA Standards for Criminal Justice Prosecution Function and Defense Function*, § 3–6.6(d) (4th ed. 2015) (stating that "[t]he prosecutor should not bring to the attention of the trier of fact matters that the prosecutor knows to be inadmissible, whether by offering or displaying inadmissible evidence, asking legally objectionable questions, or making impermissible comments or arguments. If the prosecutor is uncertain about the admissibility of evidence, the prosecutor should seek and obtain resolution from the court before the hearing or trial if possible, and reasonably in advance of the time for proffering the evidence before a jury.").

(Emphasis added.) The court denied the State's motion, ruling that the State did not offer the evidence for a proper purpose and that it was precisely the kind of evidence that W.R.E. 404(b) prohibits.

[¶53] The second pretrial ruling was precipitated by Mr. Bogard's motion to introduce evidence regarding SK's relationship with her roommate and on-again-off-again boyfriend under Wyoming Statute § 6-2-312.[10] The defense sought to introduce the evidence to support its theory that SK fabricated the sexual assault to rekindle her romantic relationship with her roommate. Towards the end of a hearing on Mr. Bogard's motion, the district court questioned whether the State should be allowed to introduce evidence regarding Mr. Bogard's relationship with Ms. K if the court admitted evidence regarding SK's relationship with her roommate. The State argued that it should, and defense counsel conceded that such evidence would not constitute 404(b) evidence. The court then took the matters under advisement.

[¶54] Following the hearing, the court issued a written order in which it ruled that the defense could introduce evidence regarding non-sexual aspects of SK's relationship with her roommate to support the defense's theory about SK's allegation against Mr. Bogard. The court also ruled that the State could introduce non-404(b) evidence regarding Mr. Bogard's relationship with Ms. K but did not issue a formal written order on that matter, leaving the parameters of the evidence the State could introduce somewhat unclear. The record suggests that the State could introduce evidence about Mr. Bogard's dating relationship with Ms. K because they exchanged text messages on the night of the alleged sexual assault and Ms. K went to the Ranger bar that night to briefly show one of her friends what Mr. Bogard looked like. The court never parted from its ruling that the State could not introduce the proposed 404(b) evidence about the sexual encounter at Mr. Bogard's apartment.

[¶55] The record plainly confirms that the prosecutor used the "negative experience" to refer to Ms. K's previous sexual encounter with Mr. Bogard—the very evidence the district court ruled inadmissible under W.R.E. 404(b). Despite the court's clear 404(b) ruling, the prosecutor repeatedly and unnecessarily referenced Ms. K's "negative experience" after she mentioned it once. The prosecutor asked Ms. K, in rapid succession: whether the "negative experience" made her disinterested in continuing her romantic involvement with Mr. Bogard; whether she saw Mr. Bogard again after the "negative experience"; whether

---

[10] Wyoming Statute § 6-2-312 is "commonly referred to as the 'Rape Shield Law.'" *Budig v. State*, 2010 WY 1, ¶ 10, 222 P.3d 148, 152 (Wyo. 2010). "This statute sets forth a specific procedure the defendant must follow if he intends to offer 'evidence of the prior sexual conduct of the victim, reputation evidence or opinion evidence as to the character of the victim.'" *Id.* (quoting Wyo. Stat. Ann. § 6-2-312(a)(Lexis Nexis 2009)). The statute is intended to protect sexual assault victims "from embarrassment and abuse at trial" and to encourage victims to report such crimes. *Budig*, ¶ 13, 222 P.3d at 154 (quoting *Heinrich v. State*, 638 P.2d 641, 646 (Wyo. 1981)).

she did not want to go to dinner with Mr. Bogard and his friend "[b]ecause of that negative experience"; to reconcile why she went to the Ranger after she had the "negative experience" and declined to go to dinner with Mr. Bogard; and not once, but twice, whether she told her friend about the "negative experience" before they went to the Ranger.[11]

[¶56]   Though the prosecutor did not elicit testimony about precisely what the "negative experience" entailed, the context of Ms. K's testimony certainly left an impression that Mr. Bogard had done something unsavory to Ms. K.  The prosecutor's questions regarding the "negative experience" immediately followed Ms. K's testimony that she met Mr. Bogard on "Tinder."  Although Ms. K initially thought Tinder "was just a dating app, a way to meet []new people,"  over time she "came to realize it's more for just hookups, meeting people like that[.]"  She confirmed that a "hookup" is "a quick sexual encounter[.]"  She stopped using Tinder "[s]hortly after [her] encounter with Mr. Bogard."  Ms. K also provided the jury an overview of each of her dates with Mr. Bogard.  On their first date, they went to a couple of bars and she went home alone.  On their second date a week later, they went to dinner and he kissed her goodbye.  On their final date, she had dinner at his apartment, where the "negative experience" occurred.

[¶57]   In this context, we have little trouble concluding that the prosecutor's repeated comments regarding the "negative experience" could only have referred to the evidence the district court ruled was inadmissible and were made for the purpose of leaving the jury with the impression that the "negative experience" consisted of an unpleasant sexual encounter between Mr. Bogard and Ms. K.[12]  By alluding to inadmissible evidence in his questioning of Ms. K, the prosecutor committed misconduct.  *See Wilde*, ¶ 27, 74 P.3d at 711; *State v. Van Wagner*, 504 N.W.2d 746 (Minn. Ct. App. 1992) (noting that "[s]erious misconduct is present not only when the prosecutor succeeds in presenting the inadmissible evidence, but also when he asks questions alluding to such inadmissible evidence").

### 2.      *Both prosecutors engaged in improper victim impact argument unrelated to credibility.*

[¶58]   We review for harmless error two statements Mr. Bogard argues constitute impermissible victim impact argument.  The first statement occurred during closing argument, when one of the prosecutors argued that SK did not consent to what occurred in the bathroom.

> This was not consent.  This was not silence.  [SK] spoke in that
> bathroom.  [SK] cried in that bathroom.  [SK] cried eight

---

[11] In closing argument, the prosecutor mentioned the "negative experience" one more time, stating "[a]t 2:08 Travis Bogard is sending an angry and frustrated text to [Ms. K], his Tinder match, who he already had a negative experience with."

[12] To the extent Mr. Bogard questions the relevancy of Ms. K's testimony, he does so in the limited context of his ineffective assistance of counsel claim.  We do not reach that claim in this opinion.

> minutes after she left that bathroom. [SK] cried 25 minutes after she [left] that bathroom. [SK] cried for three weeks after that bathroom. [SK] has now cried for a year after leaving that bathroom.

Defense counsel objected to this argument as "impact evidence" and the trial court sustained his objection.

[¶59] The second statement occurred during rebuttal argument when the other prosecutor asked the jury to consider SK's actions after the alleged assault. The prosecutor asked the jury to "[w]atch [SK's] demeanor," adding that "[y]ou even heard her at the beginning of her testimony, the effects of this, how she's dropped out of school."[13] After the court sustained defense counsel's objection, the prosecutor resumed discussing what SK did after the assault, noting that she spoke to Officer McAlmond and cooperated in a SANE examination.

[¶60] The district court sustained defense counsel's objection to the first statement as victim impact argument and sustained defense's counsel's general objection to the second statement. Although defense counsel did not identify his precise objection to the second statement, the district court could have reasonably viewed the statements as improper victim impact argument. We find error in both statements because the prosecutors impermissibly commented on the impact the crime had on the victim without linking that impact to credibility. *Cf. White*, ¶ 20, 80 P.3d at 651; *see also King* ¶ 11, 417 P.3d at 660 (citing *Gonzalez–Ochoa*, ¶ 15, 317 P.3d at 604) (explaining that before we consider whether an error was harmless, we must find there was an error). Additionally, the second statement argued facts not in evidence. SK never testified that she dropped out of school as a result of the incident at the Ranger bar. Rather, she testified that she was no longer attending the University of Wyoming or living in Laramie.

[¶61] For these reasons, the prosecutors engaged in improper victim impact argument in closing and rebuttal argument, respectively.

### 3.  *The prosecutor repeatedly argued facts that were not in evidence.*

[¶62] We review for plain error Mr. Bogard's argument that the prosecutor argued facts that were not in evidence by repeatedly stating that SK was sobbing in the bathroom during the alleged assault. He contends that the prosecutor did so to appeal to the jury's sympathy and to bolster the State's evidence that she did not consent.

---

[13] This is the only instance of alleged prosecutorial misconduct attributable to the County Attorney, as opposed to the Deputy County Attorney.

[¶63]   The statements at issue are clearly reflected in the record.  During closing argument, the prosecutor repeatedly stated that SK was sobbing during the assault:

> The Defendant stuck his penis without [SK]'s consent inside of her vagina in that disgusting bathroom after forcing her, picking her up the same way he picked [Ms. K] up, picking her up and carrying her at will because he was double her size, **preventing her from leaving while she's sobbing uncontrollably**, because he's double her size.  Disregarding her attempts regardless of whether or not her fingernails were used to stop him, because he's double her size.
>
> . . . .
>
> Bending her over that tub, dragging her across that wall, pushing her against the other wall, **lifting her onto the sill while she's sobbing** is the actual application of physical force, which the Defendant reasonably calculated would cause submission of [SK].
>
> . . . .
>
> In order for [SK] to have consented, it must have been voluntary through her words, actions, or both.  Again, neither occurred.  "Stop." "I want to go back to my friends." "Please let me go back to my friends." **Sobbing, pulling away, resisting.**
>
> . . . .
>
> It's not reasonable to keep fighting.  Dr. Gray himself said it. It's a survival response, a biological survival response to eventually just take it, and that's what [SK] did.  **After sobbing hysterically she just took it as he violently penetrated her vagina until it bled.**
>
> . . . .
>
> **She knows she sobbed hysterically**, "Please stop, stop, let me go back to my friends, I just want to see my friends. Let me go."
>
> . . . .

18

> She did not consent to being continually moved around **as she sobbed** and said, "Please let me go back to my friends."

(Emphasis added.)

[¶64] Mr. Bogard is correct in asserting that "[i]t is unethical for a prosecutor intentionally to misstate the evidence." *Bustos v. State*, 2008 WY 37, ¶ 9, 180 P.3d 904, 907 (Wyo. 2008) (citing *Butz v. State*, 2007 WY 152, ¶ 28, 167 P.3d 650, 657 (Wyo. 2007); *Wilks v. State*, 2002 WY 100, ¶ 30, 49 P.3d 975, 987 (Wyo. 2002); *Trujillo v. State*, 2002 WY 51, ¶ 5, 44 P.3d 22, 24 (Wyo. 2002)); *see also Burton v. State*, 2002 WY 71, ¶ 37, 46 P.3d 309, 318 (Wyo. 2002) ("A prosecutor may not misrepresent the evidentiary facts in his closing argument."). A prosecutor "is allowed latitude in presenting closing argument" and may "reflect upon the evidence admitted at trial and draw reasonable inferences from that evidence." *Wilks*, ¶ 30, 49 P.3d at 987 (citation omitted). But closing argument is "limited to the evidence presented in the courtroom." *Youngberg v. State*, 2012 WY 119, ¶ 7, 284 P.3d 820, 823 (Wyo. 2012) (citation omitted).

[¶65] The State concedes that SK did not testify that she sobbed during the alleged assault. The record reflects that when the prosecutor asked SK what she communicated to Mr. Bogard in the bathroom to try to make him stop, she responded: "I said, 'I want to go back to my friends.' 'I don't want to be here.' 'Stop, stop.' 'I want to go back to my friends.' I didn't want to be here. Just over and over again." She never testified that she cried or sobbed during the assault.[14] We found nothing in the record to support a reasonable inference that SK was sobbing during the assault. On this record, we must conclude that the prosecutor intentionally argued facts not in evidence, and in doing so, committed misconduct.

### 4. The prosecutor intentionally used inflammatory language in closing argument.

[¶66] Mr. Bogard argues that the prosecutor made statements calculated to inflame, prejudice, and mislead the jury by using abusive language during closing argument when he walked the jury through the sequence of events that were reflected in the surveillance video from the Ranger bar and stated:

> 2:15 the surveillance starts. **2:16 she's led to the after party, not led to go hook up and get f[***]ed in a bathroom**, to an after party. 2:17 is the last view we get of [SK] before she is assaulted and turned into a victim in that bathroom. By 2:29 she is a victim and Travis Bogard has committed the crime of

---

[14] Paragraph 62 above identifies another instance in which the prosecution argued facts not in evidence, stating that SK "cried in that bathroom."

19

> sexual [assault] and kidnapping. Doesn't look too upset about
> it on that video but commits the crime of sexual assault and
> kidnapping. 2:29 is our first view of him in camera.

(Emphasis added.)

[¶67]  Reviewing Mr. Bogard's claim for plain error, we note that courts generally find it permissible for a prosecutor to repeat profanity in argument when the profanity is part of the evidence presented at trial.[15]  Otherwise, courts condemn counsel's use of profanity in the courtroom.[16]  We have never specifically addressed the parameters under which a prosecutor may use profanity in argument; however, it is well-settled that "arguments calculated to inflame the passion or prejudice of the jury violate ABA Standards for Criminal Justice regarding argument to the jury." *Black*, ¶ 33, 405 P.3d at 1056 (citations omitted).  The word "inflammatory" means "[t]ending to cause strong feelings of anger, indignation, or other type of upset; tending to stir the passions." *Black's Law Dictionary* 931 (11th ed. 2019).

[¶68]  The prosecutor's use of profanity was entirely unnecessary to his presentation of the timeline.  Instead, it was an obvious attempt to invoke feelings of anger, indignation, and outrage in the jury about what Mr. Bogard allegedly did to SK in the bathroom.  Mr. Bogard has therefore established that the prosecutor violated the clear and unequivocal rule of law in a clear and obvious way.

---

[15] *See, e.g.*, *People v. Polite*, 236 Cal.App. 2d 85, 92, 45 Cal.Rptr. 845, 850 (Ct. App. 1965) (noting that "[e]veryone, including the trial judge, knows the limits beyond which a lawyer should not trespass.  For example, the use of profanity except in quotation from evidence in the record[.]"); *People v. Land*, 2011 IL App (1st) 101048, ¶¶ 157–60, 955 N.E.2d 538, 564 (Ill. App. Ct. 2011) (finding the district court did not err when it permitted the State to quote the defendant's profanity to demonstrate that the defendant could become extremely angry at a completely innocent individual); *Howell v. State*, 2006 OK CR 28, ¶ 17, 138 P.3d 549, 557 (Okla. Crim. App. 2006) ("The trial court did not abuse its discretion when it allowed the prosecutor to reference Howell's actual words in its examination of witnesses and closing argument"); *Edwards v. Harris*, No. CV 12-2700-FMO RZ, 2014 WL 4425797, at *19 (C.D. Cal. June 20, 2014) (concluding that the prosecutor permissibly repeated the defendant's statements that contained profanity).
[16] *State v. Groce*, 2014 VT 122, ¶ 24, 198 Vt. 74, 84–85, 111 A.3d 1273, 1281 (Vt. 2014) (noting that the State's use of offensive language in closing argument—namely the word "slut"—was improper and the word has no place in Vermont courts); *People v. Harrison*, 35 Cal.4th 208, 259, 106 P.3d 895, 928 (Cal. 2005) (stating that the court does "not condone the use of profanity in arguments to the jury"); *Pingatore v. Montgomery Ward & Co.*, 419 F.2d 1138, 1142 (6th Cir. 1969) (reviewing the "intemperate argument of counsel" and, in the course of doing so, stating that "[c]urse words have no place in the courtroom"); *Rhoden v. Peoria Creamery Co.*, 278 Ill. App. 452, 471 (Ill. App. Ct. 1934) (reflecting that defense counsel's use of the word "damn" was not necessary to the argument and advising counsel to "refrain from violating the proprieties of his profession" in the future).

## II.    *Did cumulative error deprive Mr. Bogard of a fair trial?*

[¶69]   "In conducting a cumulative error evaluation, we consider only matters that we have determined to be errors." *Guy v. State*, 2008 WY 56, ¶ 45, 184 P.3d 687, 701 (Wyo. 2008) (citing *McClelland v. State*, 2007 WY 57, ¶ 27, 155 P.3d 1013, 1022 (Wyo. 2007)).  We have identified several instances of prosecutorial misconduct in Mr. Bogard's second trial: during the State's case-in-chief, the prosecutor violated the court's W.R.E. 404(b) order when he repeatedly referenced Ms. K's "negative experience" with Mr. Bogard; during closing argument, that same prosecutor engaged in improper victim impact argument, argued facts not in evidence, and used language intended to inflame the passions of the jury; and during rebuttal argument, the other prosecutor engaged in improper victim impact argument, again arguing facts not in evidence.  We now evaluate these instances to determine whether, cumulatively, they prejudiced Mr. Bogard.  "[A] series of . . . errors will only be cause for reversal where the accumulated effect constitutes prejudice and the conduct of the trial is other than fair and impartial." *Sam*, ¶ 61, 401 P.3d at 855 (citing *Watts v. State*, 2016 WY 40, ¶ 23, 370 P.3d 104, 112 (Wyo. 2016)).

[¶70]   Each cumulative error analysis is unique. *See Black*, ¶¶ 45–52, 405 P.3d at 1060–61; *Hamilton*, ¶¶ 19–20, 396 P.3d at 1015–16; *Watts*, ¶¶ 23–25, 370 P.3d at 112–13.  There is no litmus test to easily identify whether prejudice occurred in any given case.  Rather, in each case, we evaluate the possibility of prejudice in the context of the entire record. *Hathaway v. State*, 2017 WY 92, ¶ 33, 399 P.3d 625, 634 (Wyo. 2017) (citations omitted).

[¶71]   Regardless of whether an error is identified applying the harmless or plain error standard of review, we focus on whether instances of prosecutorial misconduct "affected the accused's 'substantial rights.'" *Sam*, ¶ 65, 401 P.3d at 856 (quoting *White*, ¶ 7, 80 P.3d at 646).  There is no question Mr. Bogard has a substantial right to a fair trial. *Id.* (citing Wyo. Const. art. 1 §§ 6, 9, and 10).  A reversal, however, must be grounded in our conclusion that "a reasonable possibility exists that, in the absence of the error[s], the verdict might have been more favorable" to Mr. Bogard. *Id.* (citation omitted).  Mr. Bogard therefore "must show prejudice under 'circumstances which manifest inherent unfairness and injustice or conduct which offends the public sense of fair play.'"[17] *McGinn*, ¶ 13, 361 P.3d at 299 (quoting *Phillips v. State*, 2007 WY 25, ¶ 8, 151 P.3d 1131, 1134 (Wyo. 2007)).

[¶72] The single most significant factor in determining whether Mr. Bogard was prejudiced by the prosecutorial misconduct is the strength of the State's case against him. *See Hathaway*, ¶ 33, 399 P.3d at 634–35 (citations omitted).   Other important considerations in this case are: (1) whether the errors related to a material, consequential

---

[17] The State asserts that Mr. Bogard does not set forth cogent argument on the issue of cumulative error. Although we will not construct an argument for an appellant, *Woods*, ¶ 18, 401 P.3d at 969, Mr. Bogard's argument does not require us to do so.  His brief contains discussions of harmless error and plain error, both of which address the effect of the alleged prosecutorial misconduct on the trial, and he incorporates those arguments into his cumulative error analysis.

21

fact; (2) the effect of the court's instructions to the jury; and (3) the severity and pervasiveness of the misconduct. *See, e.g.*, *Sam*, ¶ 66, 401 P.3d at 856; *McGinn*, ¶ 16, 361 P.3d at 299–300; *Hathaway*, ¶ 33, 399 P.3d at 635.

[¶73] Mr. Bogard argues that the strength of the State's case against him was not overwhelming because there were only two witnesses inside the bathroom where the alleged sexual assault occurred. To emphasize the strength of its case against Mr. Bogard, the State points us to evidence placing him at the Ranger bar, SK's injuries, and the DNA evidence. We conclude this evidence offers little in the way of mitigating any prejudice resulting from prosecutorial misconduct. First, the State's evidence placing Mr. Bogard at the scene of the crime—which consisted of eyewitness testimony and the surveillance video from the bar—carries little weight because Mr. Bogard never contested his presence at the bar that night, much less his presence in the bathroom during the time in which SK alleged the assault occurred. Second, as shown below, the record demonstrates that the State's physical evidence was as consistent with Mr. Bogard's account of what happened as it was with SK's account.

[¶74] Ms. Burch, the SANE nurse who examined SK at the hospital, testified about SK's external and internal injuries, as well as the evidence she collected from SK at the hospital. As far as internal injuries, Ms. Burch observed a tear to SK's vagina that was actively bleeding. The laceration was located approximately one inch inside SK's vagina, it was almost the size of the Q-tip, and she considered it to be a significant laceration. Ms. Burch determined the tear was caused by blunt force trauma. On cross-examination, Ms. Burch confirmed that lacerations to the vagina could, but did not necessarily, indicate sexual assault. She also confirmed that consensual sex can result in lacerations and tears to the vagina, agreeing that such injuries could occur if the woman was not fully lubricated. On redirect, Ms. Burch confirmed that SK's injuries could be consistent with a sexual assault. Her testimony was not conclusive as to whether Mr. Bogard sexually assaulted SK.

[¶75] Ms. Ley, the forensic analyst, testified about DNA testing of the vaginal and anal swabs. She performed "YSTR" testing—which only targets the Y chromosome that is present in males—on the vaginal swabs and she performed "autosomal testing"—also known as "total human testing"—on the anal swabs. YSTR testing of the vaginal swabs revealed a single source profile that was consistent with Mr. Bogard. The particular YSTR profile is found in approximately 1 in every 3,571 males. The vaginal swabs tested negative for the presence of seminal fluid. The anal swabs also tested negative for the presence of seminal fluid. Although there was male DNA present on the anal swabs, there was an insufficient quantity of male DNA present for further testing. The lab did not produce any result from that sample. Ms. Ley's testimony, like the SANE nurse's, was not conclusive as to whether Mr. Bogard sexually assaulted SK.

[¶76] For these reasons, we agree with Mr. Bogard that this is a "she said, he said" sexual assault case, with the State primarily relying on the credibility of SK's testimony to prove

lack of consent. We will evaluate whether Mr. Bogard's substantial right to a fair trial was prejudiced by the prosecutors' misconduct in this context.

[¶77] The record, including Mr. Bogard's testimony from his first trial, as read to the jury by the State in his second trial, unequivocally identifies the timing of SK's withdrawal of consent as a central issue. By Mr. Bogard's account, when he accidentally attempted to penetrate SK anally, she violently pulled away but did not say anything. He attributed her pulling away to the fact that he had accidentally attempted to penetrate her anally rather than vaginally. He then penetrated her vagina slightly and when she violently pulled away again, he took that as his rejection. He immediately stopped, pulled up his clothing, and left the bathroom.

[¶78] By SK's account, she willingly followed Mr. Bogard into the bathroom, and they consensually kissed as they entered. They continued to consensually kiss. However, when Mr. Bogard took her purse off and put it in the sink, she told him that she wanted to go back to her friends. Subsequently, she tried to apply a pressure point to his shoulder and, to get out of the bathroom, used her foot to try to twist open the doorknob. When Mr. Bogard tried to penetrate her from behind, SK testified that she flinched and repeatedly told him that she did not want to be there and wanted to go back to her friends.

[¶79] In light of this evidence, the trial court instructed the jury that consent is a defense to the charge of sexual assault in the first degree. The instruction defined the elements of the defense, and correctly informed the jury that consent was a question of fact for it to determine and "[t]he State must prove the lack of consent beyond a reasonable doubt."

[¶80] How the State argued SK's credibility and Mr. Bogard's credibility to the jury is therefore of utmost importance in our assessment of whether Mr. Bogard has demonstrated he was denied a fair trial.[18] As noted above, Mr. Bogard argues that because his conviction

---

[18] Both SK's and Mr. Bogard's credibility were at issue throughout the trial. *See Black*, ¶¶ 45–51, 405 P.3d at 1060–61 (finding it important to our cumulative error analysis that the credibility of the State's key witness was at issue throughout trial).

On cross-examination, defense counsel identified inconsistencies between SK's version of events on direct examination and her prior testimony and statements to police. The most important inconsistencies included whether SK had two or three shots at the Ranger bar before accompanying Mr. Bogard to the bathroom, whether her costume was pulled up over her shoulders or down off her shoulders and tied around her waist when she entered the bathroom with Mr. Bogard, whether Mr. Bogard pushed her into the bathroom or led her in by her hand, whether she scratched Mr. Bogard's shoulder, whether she said "no" or "stop" to him, and whether Mr. Bogard said anything to her during the alleged assault to encourage her to stay in the bathroom. The inconsistencies in her version of events on those points called into question whether she accurately recalled what happened that night. In fact, the State called an expert to discuss "trauma memory" and relied on the expert's testimony in closing to attempt to minimize the inconsistencies.

was largely dependent on the jury believing SK instead of him, the pervasive effect of the prosecutors' misconduct was to deprive him of a fair and impartial trial.

[¶81]   We agree with Mr. Bogard that much of the prosecutorial misconduct went to the very heart of SK's and his credibility on the central issue of consent, which, as the district court instructed, was an issue of material, consequential fact.   When the prosecutor repeatedly stated that SK was "sobbing," "sobbing uncontrollably," and "sobbing hysterically," he simultaneously bolstered the State's argument that SK did not consent and undermined Mr. Bogard's credibility with facts not in evidence.   The prosecutor's references to Ms. K's "negative experience" implied that if Mr. Bogard did something unsavory to Ms. K at his apartment, he probably also assaulted SK at the Ranger, thereby bolstering SK's credibility and undermining Mr. Bogard's credibility.   *See* W.R.E. 404(b) (noting that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith.").   The prosecutor's gratuitous use of inflammatory language when he stated that SK was "led to the after party, not led to go hook up and get f[***]ed in a bathroom" encouraged the jury to convict Mr. Bogard based on anger and outrage instead of the evidence.   The prosecutors' improper victim impact argument placed the focus on the victim's suffering, instead of the evidence, in a case where the State's evidence was not overwhelming.[19]

The prosecution highlighted for the jury a significant inconsistency in Mr. Bogard's version of events through the bartender's testimony.  During his first trial, Mr. Bogard testified that he considered SK to have rejected him when she violently pulled away from him a second time.  By Mr. Bogard's account, after he left the bathroom and walked back to the bar, he talked to the bartender about getting rejected.  But then on cross-examination, Mr. Bogard conceded that he "potentially" made a comment to the bartender about a "slow clap."  The State called the bartender, Mr. Aanenson, to discuss precisely what Mr. Bogard said to him after Mr. Bogard left the bathroom.  After refreshing his recollection with the transcript of his testimony from the first trial, Mr. Aanenson recalled that Mr. Bogard said, "When this gal comes out of here, we got to give her a slow clap."  Mr. Aanenson interpreted that as an affirmation of "some fooling around, some hooking up."  Mr. Aanenson did not testify that Mr. Bogard said anything to him about rejection.

[19] The State's evidence included SK's written statement to the police about the alleged assault, which the district court allowed SK to read to the jury and admitted as an exhibit.  Mr. Bogard argues that the district court abused its discretion when it admitted the "written statement . . . into evidence substantively, thereby allowing the jury to consider it during deliberations" and emphasizing SK's testimony over his.  There are two problems with this argument.  First, the district court could have reasonably admitted the written statement as an exhibit because defense counsel did not file a written objection by the deadline set forth in the court's pretrial scheduling order and suffered the consequence set forth in the order for not doing so: admission of the exhibit if relevant.  *See Martinez v. State*, 2018 WY 147, ¶ 29, 432 P.3d 493, 500 (Wyo. 2018) (explaining that "[i]n applying the abuse of discretion standard, 'we can affirm on any legal ground appearing in the record.'"); *Tracy v. Tracy*, 2017 WY 17, ¶ 43, 388 P.3d 1257, 1267 (Wyo. 2017) (citing *Stocki v. Nunn*, 2015 WY 75, ¶ 69, 351 P.3d 911, 931 (Wyo. 2015)) (noting that "trial courts have broad discretion to enforce their scheduling orders by sanctions or otherwise.").  Second, to the extent that Mr. Bogard intends to challenge the district court's decision to allow the jury to take SK's written statement into the jury room during deliberations, he has not set forth cogent argument or citation to pertinent legal authority on that distinct issue.  *See Woods*, ¶ 18, 401 P.3d at 969 (citation omitted) (noting that we "will

[¶82]   We acknowledge that the district court sustained defense counsel's objections to the prosecutors' victim impact arguments in closing and rebuttal.  And the district court twice instructed the jury that arguments of counsel are not evidence.  The district court also instructed the jury that the law forbade it from being "governed by mere sentiment, conjecture, sympathy, passion, [or] prejudice" and that the litigants had the right to demand and expect that the jury would "conscientiously and dispassionately consider and weigh the evidence and apply the law of the case."  In addition, the court instructed the jury on the rules that must govern its evaluation of witness credibility.  We generally presume that juries follow their instructions.  *Farrow v. State*, 2019 WY 30, ¶ 64, 437 P.3d 809, 825 (Wyo. 2019) (citation omitted).  However, we also recognize that jury instructions do not mitigate prejudice in every case.  *See, e.g.*, *Sweet*, ¶¶ 30–36, 234 P.3d at 1205–06 (concluding that a general jury instruction regarding the jury's role in determining witness credibility was insufficient to alleviate prejudice from a law enforcement officer's statements that "invade[d] the exclusive province of the jury" where "[c]rediblity was the pervasive issue").

[¶83]   This is such a case.  The instructions the district court gave the jury **before** closing arguments were not enough to mitigate prejudice where, as here, the record clearly shows:

- the State's evidence that Mr. Bogard committed first degree sexual assault was largely limited to SK's testimony and its use of Mr. Bogard's testimony from the first trial;

- much of the prosecutorial misconduct went to the very heart of SK's credibility and Mr. Bogard's credibility on the central issue of consent, which, as the district court instructed, was an issue of material, consequential fact; and

- the prosecutorial misconduct included instances in which the prosecutor deliberately drew the jury's attention to inadmissible evidence and argued facts not in evidence.

*See Sam*, ¶ 66, 401 P.3d at 856; *McGinn*, ¶ 16, 361 P.3d at 299–300; *Hathaway*, ¶ 33, 399 P.3d at 635; *see also* 2 Paul DerOhannesian II *Sexual Assault Trials* § 15.1 (4th ed. 2014) (citing *State v. Henderson*, No. 99-T-0001, 2000 WL 1459858, at *7 (Ohio Ct. App. 2000))

---

not frame the issues for the litigants and will not consider issues not raised by them and not supported by cogent argument and authoritative citation.").  In particular, Mr. Bogard fails to acknowledge that "[t]he underlying 'admissibility' of written evidence in a case is a separate and distinct issue from whether that evidence should be allowed to go out with the jury."  *See Clark v. State*, 284 Ga. 354, 355, 667 S.E.2d 37, 39 (Ga. 2008) (citation omitted); *see also Pino v. State*, 849 P.2d 716, 718–19 (Wyo. 1993) (discussing rules regarding a trial court's authority to permit nontestimonial, as opposed to testimonial exhibits, into the jury room during deliberations).

(noting that "[t]he effect of improper comments may be magnified when the proof in the sexual assault case is limited to the complainant's testimony"). Finally, the prosecutorial misconduct in this case was both severe and pervasive.

[¶84] The risk that the jury failed to follow the court's instructions and considered improper matters in reaching its verdict is too great, and the consequence of any such failure is too vital to Mr. Bogard, for us to conclude that no prejudice resulted from the prosecutorial misconduct in this case.[20] As we have said before, "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." *Black*, ¶ 50, 405 P.3d at 1060–61 (quoting *McGinn*, ¶ 15, 361 P.3d at 299). And, as we say again, "[t]he prosecutor's role in ensuring a fair trial cannot be understated." *Id.* ¶ 50, 405 P.3d at 1061. In the oft-quoted words of the United States Supreme Court, "while [the prosecutor] may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Id.* (quoting *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935), *overruled on other grounds by Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960)).

## *CONCLUSION*

[¶85] "[T]he Constitution guarantees only a fair trial, not a perfect one." *Law v. State*, 2004 WY 111, ¶ 41, 98 P.3d 181, 195 (Wyo. 2004) (citation omitted). Mr. Bogard has established that his trial was not fair. We must therefore reverse and remand for a new trial.

---

[20] Not only was Mr. Bogard sentenced to serve five to ten years in prison, he is required to register as a sex offender in the State of Wyoming for the duration of his life as a result of his conviction for sexual assault in the first degree. *See* Wyo. Stat. Ann. § 7-19-302(j) (LexisNexis 2019); Wyo. Stat. Ann. § 7-19-304(a) (LexisNexis 2019).

**DAVIS, Chief Justice, specially concurring.**

[¶86] I concur in the majority opinion. I write separately in the hope that claimed errors the majority opinion understandably did not address might be avoided on retrial.

### 1. Allowing SK's Statement Into Jury Room

[¶87] SK made a written statement to law enforcement when she reported her allegations. At trial, the district court admitted that statement into evidence and allowed it to go to the jury room during deliberations without objection. Mr. Bogard claimed error on appeal in both the admission of the statement and in allowing it to go to the jury room. While I agree with the majority that Mr. Bogard failed to support his claim with cogent argument, I also believe that the statement should not have gone to the jury room. Because we are remanding for a new trial, I address the question.

[¶88] Concerning the evidence that may go with a jury into its deliberations, we have said:

> The general rule is that testimonial video or audio tape recordings should be permitted in the jury room only in rare circumstances because they may function as a "speaking witness" whose testimony may be unduly emphasized. Even when permitted, a trial court may allow the playing of only relevant portions of the tape under controlled procedures. *Munoz v. State*, 849 P.2d 1299, 1301 (Wyo. 1993); *Pino v. State*, 849 P.2d 716, 718-19 (Wyo. 1993).

*Warner v. State*, 897 P.2d 472, 475 (Wyo. 1995).[21]

[¶89] Our decisions have not expressly defined the distinction between testimonial and nontestimonial evidence for purposes of this rule, but Colorado courts have provided helpful guidance. They define a testimonial out-of-court statement as one that narrates past events, and nontestimonial evidence as that which depicts an event itself rather than providing a narration of it. *People v. Rogers*, 68 P.3d 486, 494 (Colo. App. 2002) (citing *People v. Aponte*, 867 P.2d 183, 188 (Colo. App. 1993)).[22] This is consistent with our Court's treatment of such evidence. *See Warner*, 897 P.2d at 475 (tape recording of drug transaction properly allowed into jury deliberations as nontestimonial exhibit); *Munoz v.*

---

[21] Wyo. Stat. Ann. § 1-11-209 (LexisNexis 2019) allows a jury to request clarification of testimony if during deliberations a disagreement arises as to any part of the testimony, subject to certain procedures. It does not, however, change the general rule against submitting testimonial materials to the jury for unsupervised and unrestricted review during deliberations. *Chambers v. State*, 726 P.2d 1269, 1276 (Wyo. 1986).

[22] Colorado has since relaxed its prohibition on allowing testimonial exhibits to go with the jury during deliberations and now leaves that to the discretion of the trial court. *Frasco v. State*, 165 P.3d 701, 704-05 (Colo. 2007) (en banc).

*State*, 849 P.2d 1299, 1301 (Wyo. 1993) (same); *Pino v. State*, 849 P.2d 716, 719 (Wyo. 1993) (same); *Taylor v. State*, 727 P.2d 274, 276 (Wyo. 1986) (holding videotaped interview of victim to be testimonial); *Schmunk v. State*, 714 P.2d 724, 728, 744 (Wyo. 1986) (videotaped pre-arrest interview held to be testimonial).

[¶90] SK's written statement to law enforcement is a narrative of her allegations against Mr. Bogard and is therefore testimonial. Therefore, it should not go to the jury room during deliberations.[23]

## 2. Relevance of Ms. K's Testimony

[¶91] The majority addressed Ms. K's testimony in ruling on Mr. Bogard's claim of prosecutorial misconduct, and I am in complete agreement with that holding. I also understand that because of its reversal on those grounds, the Court had no need to address the ineffective assistance of counsel claim based on counsel's failure to object to Ms. K's testimony as irrelevant. Because, however, we are remanding for a new trial, and I believe Ms. K's testimony was irrelevant and should not have been admitted under W.R.E. 403, I take this opportunity to address it.

[¶92] The district court disallowed any 404(b) evidence about the sexual encounter between Mr. Bogard and Ms. K. The court did allow testimony about Ms. K's dating history with Mr. Bogard, that she saw Mr. Bogard at the Ranger on the night of the alleged assault, and her exchange of text messages with him that evening. The court's ruling resulted in the following, as summarized by the majority at ¶¶ 49-50 (footnote omitted):

> The State called Ms. K on the third day of trial to testify about her relationship with Mr. Bogard. She testified that she met Mr. Bogard through a dating app and went on a couple of dates with him. On their first date, she went to a bar with Mr. Bogard and he lifted her up "off the ground sporadically throughout the night" in what she considered a romantic gesture. When the State asked Ms. K why she stopped going on dates with Mr. Bogard, she responded that their last date, which consisted of dinner at his apartment, "was a negative experience" for her. She confirmed that the "negative experience" made her disinterested in continuing her romantic involvement with Mr.

---

[23] Although our cases have concerned video or audio recordings, testimonial writings are no different. The risk that a jury will place undue emphasis on testimonial evidence taken into deliberations exists whether the evidence is video, audio, or written. *See Schmunk*, 714 P.2d at 744 (quoting *State v. Wilson*, 360 P.2d 1092, 1098 (Kan. 1961)) ("The law does not permit depositions or witnesses to go to the jury room. Why should a witness be permitted to go there in the form of written testimony?"); *see also Rogers*, 68 P.3d at 494 (citing *People v. Ferrero*, 874 P.2d 468, 473 (Colo. App. 1993)) (no difference between transcript and videotape for purposes of this rule).

Bogard. The prosecutor subsequently referred to the "negative experience" several more times during Ms. K's direct examination. The prosecutor did not elicit any details regarding what the "negative experience" entailed.

Ms. K testified that a couple of weeks after the "negative experience," Mr. Bogard asked her to go to dinner with him and a friend in Laramie on what turned out to be the night of the alleged assault, but Ms. K told him that she was busy. Mr. Bogard said something to Ms. K in a text message about going to the Ranger bar that night and, as a result, Ms. K briefly went to the Ranger around 1:15 or 1:30 a.m. to show her friend what Mr. Bogard looked like. When Ms. K went to the bar, she saw Mr. Bogard talking to one of the bartenders, she and Mr. Bogard waved, and then she immediately left. Shortly after 2:00 a.m., Mr. Bogard texted her and she interpreted his text message to mean that he was mad at her for leaving the bar without speaking to him.

[¶93] The State contends that Ms. K's testimony was relevant. It argues (citations to the record omitted):

Ms. K was an eye witness who placed Bogard at the scene of the crime and provided insight into his emotional state approximately fifteen minutes before the crime occurred. That is relevance.

[¶94] I can see no relevance to Mr. Bogard's dating history with Ms. K to a charge of first degree sexual assault of another woman. At most, it tended to show that he was not in her estimation a great guy to go out with, and that ruling provided an opportunity for the State to suggest some kind of sexual impropriety.

[¶95] Ms. K could properly have testified to observing Mr. Bogard at the bar, but he did not deny that he was there or in the restroom where the alleged assault occurred. Additionally, Ms. K did not testify to any interaction with Mr. Bogard from which she could offer any meaningful insight into his emotional state as it related to SK. Simply stated, nothing in her testimony tended to prove or disprove an element of the crime with which Mr. Bogard was charged. Given the testimony's lack of probative value, the fact that it cannot be offered without some foundation as to how Ms. K knew Mr. Bogard, and the potential for unfair prejudice that may stem from juror speculation about the brevity of Ms. K's relationship with Mr. Bogard, Rule 403, at the very least, would make admissibility of that testimony highly questionable.

### 3.    Instruction Regarding Mr. Bogard's Testimony

[¶96]   Mr. Bogard claims ineffective assistance of counsel in his trial attorney's failure to request that the jury be instructed to evaluate his testimony as it would any other testimony. On this question, again because we are remanding for a new trial, I will simply say that if on retrial, Mr. Bogard testifies, or his testimony from the first trial is admitted, and he requests such an instruction, it should be given. *See* Wyoming Criminal Pattern Jury Instruction 1.04A.[24]

---

[24] The State suggests such an instruction may not be appropriate when testimony from a prior proceeding is presented rather than in-person testimony. The pattern jury instructions provide that a jury is to evaluate both types of testimony in the same light and using the same rules. *See* Wyoming Criminal Pattern Jury Instruction 6.02. I can see no reason that this instruction would be incorrect or inappropriate in this very rare circumstance, although it could have to be modified to some extent.

**KAUTZ, J.**, dissenting.

[¶97] The majority labels four circumstances in Mr. Bogard's trial as prosecutorial misconduct and concludes they cumulatively deprived Mr. Bogard of a fair trial. I agree with only one small portion of the majority's opinion. The prosecutor's use of foul language during closing argument was unnecessary and inappropriate. I disagree, however, that the other three complained of incidents either rose to the level of prosecutorial misconduct or that we can tell they did so on a cold record. In the absence of two or more errors, there can be no cumulative error. *Sweet v. State*, 2010 WY 87, ¶ 40, 234 P.3d 1193, 1207 (Wyo. 2010) ("'The purpose of evaluating for cumulative error is to address whether the cumulative effect of *two or more individually harmless errors* has the potential to prejudice the defendant to the same extent as a single reversible error.'") (emphasis added) (quoting *Guy v. State*, 2008 WY 56, ¶ 45, 184 P.3d 687, 701 (Wyo. 2008)). Even if there were multiple errors, they did not affect Mr. Bogard's substantial rights, whether considered individually or cumulatively. These claimed errors cannot have denied Mr. Bogard a fair trial. I respectfully dissent.

## STANDARD OF REVIEW

[¶98] Before reviewing each of the circumstances claimed to be reversible prosecutorial misconduct, it is necessary to comment on the standard of review applied to some of these circumstances. It has become increasingly common for defense appellate counsel to attempt to label evidentiary and other trial occurrences as "prosecutorial misconduct," although at trial an objection was offered on some other basis. This altered terminology, in my opinion, results in application of an inappropriate standard of review.

[¶99] Mr. Bogard objected to the prosecutor making improper victim impact statements during closing argument and his objections were sustained. Based upon the objection alone, without considering its substance, the majority applies a "harmless error" standard of review. In doing so, it does not review any district court order regarding prosecutorial misconduct because there is no such order. Defense counsel never asserted in the district court that the prosecutor committed misconduct. Nor did he move for a mistrial or seek a new trial under W.R.Cr.P. 33 on the basis of prosecutorial misconduct. *See Yellowbear v. State*, 2008 WY 4, ¶¶ 61-62, 65-66, 174 P.3d 1270, 1294-95 (Wyo. 2008). As a result, the district court did not have the opportunity to decide whether such conduct rose to the level of prosecutorial misconduct and, if so, the appropriate cure. *See Valerio v. Stare*, 429 P.2d 317, 319 (Wyo. 1967) ("'It is incumbent upon the complaining party to point out with definiteness and particularity the error of which he complains" so "'the trial court will have notice and an opportunity to cure the alleged error.'") (quoting *Murdock v. State*, 351 P.2d 674, 679 (Wyo. 1967).

[¶100] The majority decides in the first instance whether the conduct rose to the level of prosecutorial misconduct. In other words, its review is *de novo*. Because the issue of

prosecutorial misconduct was not presented to the district court, we should review this claim as we do all other claims not adequately raised below—for plain error only. *See Sanderson v. State*, 2007 WY 127, ¶¶ 13, 16, 165 P.3d 83, 88, 89 (Wyo. 2007) (reviewing for plain error the argument that testimony constituted impermissible character evidence under W.R.E. 404(a); although the defendant objected to the testimony below he did not do so on Rule 404(a) grounds); *United States v. Baldridge*, 559 F.3d 1126, 1134-35 (10th Cir. 2009) (applying plain error review to prosecutorial misconduct claim based on prosecutor's improper question to witness; while the district court sustained defense counsel's objection to the question, the objection was based on relevance not prosecutorial misconduct).

[¶101] By reviewing the alleged error *de novo*, the majority applies a less deferential standard of review than would have applied if Mr. Bogard moved for a mistrial or a new trial based on the alleged misconduct. If either of those motions had been presented to the district court, we would have reviewed the subsequent denial only for abuse of discretion. *Yellowbear*, ¶ 66, 174 P.3d at 1295 (reviewing for abuse of discretion a motion for new trial based on prosecutorial misconduct); *Capshaw v. State*, 958 P.2d 387, 390 (Wyo. 1998) ("The abuse of discretion standard applies even when the defendant bases his motion for a mistrial upon a prosecutorial misconduct claim.") (citing *Rubio v. State*, 939 P.2d 238, 241 (Wyo. 1997). In other words, by employing the *de novo* standard of review, we are "inexplicabl[y]" rewarding Mr. Bogard's inaction in the district court while at the same time encouraging appellants to re-frame alleged trial errors as prosecutorial misconduct to take advantage of a more favorable standard of review. *See United States v. Taylor*, 514 F.3d 1092, 1096 n.1 (10th Cir. 2008) (Gorsuch, J.).[25]

[¶102] Further, we are now placed in the undesirable position of having to decide not only whether there was error but also whether it was prejudicial. And we must do so on a cold record "without the benefit of the parties' and district court's contemporary analysis and assessment." *Id*. at 1096-97. ("[J]ury prejudice is a highly fact-based, circumstances-dependent issue, which the district court is far better positioned to consider than we given its close vantage to the fray."); *see also McGill v. State*, 2015 WY 132, ¶ 11, 357 P.3d

---

[25] In *Taylor*, then-Judge Gorsuch recognized the disparity:

Such motions [for mistrial], affording as they do the district court notice of a potential problem and the opportunity to exercise its discretion to cure it, are reviewed in our circuit for an abuse of discretion. Meanwhile, Mr. Taylor asks us to grant more expansive *de novo* review where a litigant does not move for a mistrial but merely objects and then remains quiet about a lurking problem in the district court's responsive curative instruction. We fail to see why smart litigants, who quite rightly conform their conduct to legal rules, would not seek to take advantage of such an inexplicable disparity in our legal regime.

*Id*. at 1096 n.1.

1140, 1145 (Wyo. 2015) ("The trial court is in the best position to assess the prejudicial impact of . . . error[s].") (citation omitted).

[¶103]   I believe the correct standard of review for all of Mr. Bogard's assertions of prosecutorial misconduct is plain error.  However, even applying the *de novo* standard of review, as the majority does, I would find no error.

**Victim Impact Argument**

[¶104] The majority decides the prosecutor's comments regarding SK being poked and prodded constitute victim impact argument.  It nevertheless concludes these comments were not improper because they were relevant to counter defense counsel's attack on SK's credibility:

> [C]redibility was a central issue at trial and defense counsel drew the jury's attention to inconsistencies in SK's story on cross-examination. The prosecutor countered the attack by arguing that SK's story remained consistent throughout the timeline of events.  In doing so, the prosecutor argued, albeit disjointedly, that it would have been unreasonable for SK to fabricate an allegation of assault, only to be subject to intrusive medical examinations and a public trial.

(Majority Op. ¶ 26).

[¶105]   However, with respect to the comments regarding SK crying eight minutes, 25 minutes, three weeks, and a year after leaving the bathroom, as well as the comment she dropped out of school, the majority concludes they constitute impermissible victim impact argument because they "impermissibly comment[ ] on the impact the crime had on [SK] without linking that impact to credibility."  (Majority Op. ¶ 60)  While I agree they constitute victim impact argument, *see Smith v. State*, 2005 WY 113, ¶ 15, 119 P.3d 411, 416 (Wyo. 2005) ("victim impact evidence is that evidence relating to the victim's personal characteristics and to the physical, emotional, or social impact of a crime on its victim and the victim's family"), I do not agree the record establishes these statements in closing argument were improper (or prejudicial).

[¶106] As the majority correctly recognizes, a prosecutor may reference victim impact evidence in argument for a proper purpose, such as to bolster a witness's credibility after it has been attacked.  *See White v. State*, 2003 WY 163, ¶ 20, 80 P.3d 642, 651 (Wyo. 2003); *Smith*, ¶¶ 15-18, 119 P.3d at 416-17.  It also correctly acknowledges Mr. Bogard attacked SK's credibility on cross-examination based on inconsistencies in her story.  Where it goes astray is deciding the prosecutor's statements regarding SK crying eight minutes, 25 minutes, three weeks and a year after leaving the bathroom were not linked to

SK's credibility. Taken in context, those statements emphasized the consistency of SK's allegations, i.e., she had consistently maintained her complaint of sexual assault against Mr. Bogard (i.e., "cried") from day 1. *See Dixon v. State*, 2019 WY 37, ¶¶ 45, 49-50, 52, 53, 438 P.3d 216, 233-36 (Wyo. 2019) (placing prosecutor's statements in closing argument in context to decide whether they were improper). They were relevant to bolster her credibility.

[¶107] Similarly, the prosecutor's statement concerning SK dropping out of school was made as the prosecutor was comparing SK's actions after leaving the bathroom with those of Mr. Bogard to counter Mr. Bogard's claim SK was lying about not having consented to the sexual encounter. As with the poked and prodded comments, the statement was relevant to rebut the claim SK had fabricated the allegations. The prosecutor was arguing it would have been unreasonable for SK to have dropped out of school had she simply made up the allegations.

[¶108] Even assuming prosecutorial misconduct in these few statements, they did not affect Mr. Bogard's substantial rights. It is axiomatic that whether we review prosecutorial misconduct under the harmless error standard or for plain error, we focus on whether the misconduct affected the defendant's substantial rights. *See Sam v. State*, 2017 WY 98, ¶ 65, 401 P.3d 834, 856 (Wyo. 2017). "'Before we hold that an error has affected an accused's substantial right, thus requiring reversal of a conviction, we must conclude that, based on the entire record, a reasonable possibility exists that, in the absence of the error, the verdict might have been more favorable to the accused.'" *Id*. (quoting *White*, ¶ 7, 80 P.3d at 646). In deciding whether prosecutorial misconduct affected the defendant's substantial rights, we consider its severity and pervasiveness, its significance to the central issues in the case, the strength of the State's evidence, and the use of cautionary instructions or other curative measures. *Sam*, ¶ 66, 401 P.3d at 856.

[¶109] The victim impact statements consisted of four lines of a lengthy closing argument and one line in a rebuttal closing argument in a case where the evidence of guilt was substantial. As explained below, the physical evidence and the testimony of other witnesses revealed Mr. Bogard's version of events to not be credible. Furthermore, defense counsel objected to both sets of statements and the district court sustained the objections. By that time, the jury had been instructed that counsel's argument is not evidence, and that it must not consider matters rejected by the court. It was also instructed "the law forbids you [from being] governed by mere sentiment, conjecture, sympathy, passion, [or] prejudice" and "[t]he litigants have the right to demand and expect that you will conscientiously and dispassionately consider and weigh the evidence and apply the law of the case." We presume it followed these instructions, and there is no indication in this case it did not do so. *Bruce v. State*, 2015 WY 46, ¶ 75, 346 P.3d 909, 931 (Wyo. 2015).

34

**Argued Facts Not in Evidence**

[¶110]  During closing argument, the prosecutor stated six times SK was sobbing during the assault and once said she "cried in that bathroom."  SK did not explicitly testify she sobbed while being assaulted or that she cried in the bathroom.  As a result, the majority concludes the prosecutor intentionally misstated the evidence.  I do not believe the record supports that conclusion.

[¶111]  There are indications in the record SK was crying while testifying.[26]  Perhaps she was crying when she told the jury Mr. Bogard began taking her clothes off while they were kissing on a ledge behind the bathroom door.  Perhaps she was crying as she told the jury how he lifted her up from the ledge and moved her near the window and tried to penetrate her from behind.  Perhaps she was crying when she described Mr. Bogard moving her over the bathtub, where he successfully penetrated her vagina.  Perhaps she was crying when she told the jury how Mr. Bogard tried to penetrate her again while she was bent over the bathtub but instead told her she "'was too fucking tight,'" yelled "'what the fuck,'" laughed, and left the bathroom.  Perhaps she was crying when she testified she told Mr. Bogard over and over again, "I want to go back to my friends," "I don't want to be here," and "Stop, stop."  If she was crying during any or all of this testimony, then perhaps it was a reasonable inference from her testimony she was sobbing during the assault.  *See Larkins v. State*, 2018 WY 122, ¶ 95, 429 P.3d 28, 50 (Wyo. 2018) ("In closing arguments, a prosecutor has wide latitude to argue the evidence in the record and all reasonable inferences which can be drawn from that evidence.") (quotations omitted); *Dysthe v. State*, 2003 WY 20, ¶ 24, 63 P.3d 875, 884 (Wyo. 2003) ("Prosecutors, just like defense counsel, may review the evidence and suggest to the jury inferences based thereon.").  Or, perhaps the prosecutor was merely being metaphorical.  Perhaps that is the reason Mr. Bogard did not object to these statements.  We simply cannot know from a cold record.

[¶112]  Nor can we know whether any misstatement was <u>intentional</u>.  *See Carrier v. State*, 2017 WY 88, ¶ 60, 400 P.3d 358, 370-71 (Wyo. 2017) ("It is unprofessional conduct for the prosecutor *intentionally* to misstate the evidence or mislead the jury as to the inferences it may draw.") (emphasis added).  SK did not directly testify <u>in this trial</u> that she cried

---

[26] At the beginning of SK's testimony, the prosecutor asked if she recalled the early morning of October 29, 2016.  SK responded, "yes."  When asked why she remembers that day, SK stated, "I was sexually assaulted."  At that time, the prosecutor said, "Okay.  And I want to take a moment -- and there's water in front of you *and tissues if you need it*.  And I want to start [with] the events leading up to that day, okay." (Emphasis added).  In his sentencing statement, Mr. Bogard stated in pertinent part, "I respect S.K.'s PTSD diagnosis and what she perceived to have happened on October 29th.  The symptoms she described were evident *in the emotion and anxiety she exhibited while giving her testimony*." (Emphasis added).  Moreover, during closing argument, the prosecutor said, "[SK] has now cried for a year after leaving that bathroom," which indicates she was crying at trial as the trial occurred a year after the incident.  While Mr. Bogard objects to this statement as improper victim impact argument, he does not contend it misstates the evidence.

during the assault, but she also did not claim she was not crying in the bathroom—she was not asked this question. However, she did testify <u>in the first trial</u> that after Mr. Bogard left the bathroom, "[s]he sat in a corner and cried." The prosecutor may have been unintentionally confusing the two trials, which would not be surprising given the first trial occurred less than four months earlier and Mr. Bogard used parts of SK's testimony from the first trial during the second trial for impeachment purposes. Moreover, the evidence showed SK to be sobbing hysterically on the 911 call, which occurred approximately eight minutes after she left the bathroom. She also appears to have been crying while talking to Officer McAlmond on the street approximately 20-25 minutes after she left the Ranger bar.[27] And the SANE nurse who examined her several hours after she left the bathroom testified SK "was anxious, sad, and very tearful. She was crying through the exam." Cross-examination of the nurse by Mr. Bogard's attorney confirmed that SK "was crying pretty much the entire time during [the] examination." The prosecutor may have been trying to infer from this evidence SK was also crying during the assault.

[¶113] I see no prejudice from any misstatement about crying or sobbing. The physical evidence and the testimony from other witnesses demonstrate Mr. Bogard's story was not credible. These statements occurred during closing argument. The jury was twice told the argument of counsel is not evidence. Again, we presume the jury followed its instructions.

**Use of Foul Language**

[¶114] The majority concludes the prosecutor committed misconduct by intentionally using "abusive" language during closing argument calculated to inflame, prejudice and mislead the jury. I agree the use of foul language was not necessary to the point he was making (outlining the sequence of events as they were reflected in the surveillance videos) and was inappropriate. While SK testified Mr. Bogard told her she "'was too fucking tight'" and yelled "'what the fuck'" during the assault, it does not appear the prosecutor's choice of similar language during argument was to reflect the evidence.

[¶115] The misconduct, however, cannot have had the effect of influencing the jury against Mr. Bogard. In fact, the prosecutor's poor word choice likely helped Mr. Bogard, as I imagine at least some of the jurors were as offended by it as we are. Perhaps that is why defense counsel did not object. Moreover, the misconduct consists of a single-word in a lengthy closing argument during a five-day trial. The trial court could have, and in my opinion should have, admonished the prosecutor for his lack of decorum. However, the prosecutor's vulgarity was an offense to the dignity of the court, and logically could not have diminished Mr. Bogard's right to a fair trial.

---

[27] At trial, the State played the video from Officer McAlmond's body camera, which captured his meeting with SK on the street. From several indications in the record, SK was crying during this meeting. However, the video is not included in the record.

**Rule 404(b)**

[¶116]   The majority concludes the prosecutor committed misconduct by repeatedly commenting on Ms. K's "negative experience" with Mr. Bogard, "which could only have referred to the evidence the district court ruled was inadmissible."   The majority then concludes that in doing so the prosecutor deliberately ignored the district court's 404(b) order.   I disagree.

[¶117]   The district court's liminal order prohibited the admission of evidence about two incidents of sexual intercourse occurring between Mr. Bogard and Ms. K approximately ten days prior to the assault.   The incidents occurred at Mr. Bogard's apartment during their third date and included non-consensual intercourse.   As the majority concedes, the State was permitted to introduce evidence concerning Mr. Bogard's and Ms. K's dating relationship.   I fail to see the relevance of that relationship.   However, the question is not whether the district court erred in allowing evidence of their dating relationship, but whether the prosecutor committed misconduct by introducing evidence of the "negative experience" in violation of the district court's Rule 404(b) liminal order.   He did not.

[¶118]   In accordance with the liminal order, Ms. K did not expressly testify about the sexual encounter she had with Mr. Bogard.   She referred instead to their third date as a "negative experience."   The reason she did so, and the reason the prosecutor continued to refer only to a "negative experience," was to abide by, not ignore, the Rule 404(b) order.

[¶ 119]   I also disagree that the jury would have necessarily inferred "negative experience" to refer to an "unpleasant sexual encounter."   I can imagine a host of "negative experience[s]" during a date which would cause one party to lose interest in another and which have nothing to do with sex or, for that matter, unpleasant sex.   In deciding otherwise, the majority acknowledges the prosecutor never elicited testimony concerning the nature of the "negative experience."   It instead relies on the context of Ms. K's testimony, specifically her testimony that (1) she initially believed Tinder to be a dating app, but later discovered its purpose was for quick sexual encounters, and (2) she met Mr. Bogard on Tinder but stopped using the app shortly after her "encounter" with Mr. Bogard. It also relies on her testimony describing each of her dates with Mr. Bogard.   But an equally plausible inference from the same evidence is the "negative experience" had nothing to do with sex.

[¶120] Ms. K testified she learned Tinder was an app for "quick sexual encounter[s]" and she met Mr. Bogard on Tinder.   Importantly, however, she did not say she learned Tinder was an app for "quick sexual encounter[s]" as a result of her encounter with Mr. Bogard. Moreover, she testified Mr. Bogard took her on several dates in which he was "romantic" by kissing her and picking her up.   This testimony seems to negate the idea Mr. Bogard used Tinder simply to have a quick sexual encounter with Ms. K.   Not only that, even though the third date was a "negative experience" for Ms. K, the jury heard she nevertheless

went to the Ranger bar on October 29 to show Mr. Bogard to her friend, waved to him, and decided to leave because "he wasn't making any efforts to come over [to her]." It would seem peculiar for the jury to have inferred from this conduct the "negative experience" was an unpleasant sexual encounter. The prosecutor did not violate the district court's 404(b) order when he referred to the "negative experience" when questioning Ms. K.

[¶121] Furthermore, I do not see how the reference to "negative experience" affected Mr. Bogard's substantial rights. The possible inferences from that reference are endless. Even assuming the jury inferred the "negative experience" to be an unpleasant sexual encounter, that is a far cry from rape. There is no logical way this testimony would have led the jury to make the inferential leap forbidden by W.R.E. 404(b), i.e., because Mr. Bogard raped Ms. K, he must also have raped SK. *See* W.R.E. 404(b) ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person *in order to show that he acted in conformity therewith*." (emphasis added)).

**Prejudice and Cumulative Error**

[¶122] The majority does not explicitly decide whether each error was individually prejudicial. It is only by considering them cumulatively that it concludes Mr. Bogard was deprived of a fair trial.

[¶123] "'The purpose of evaluating for cumulative error is to address whether the cumulative effect of *two or more individually harmless* errors has the potential to prejudice the defendant to the same extent as a single reversible error.'" *Sweet*, ¶ 40, 234 P.3d at 1207 (quoting *Guy*, ¶ 45, 184 P.3d at 701). "When making this evaluation, we consider only matters that were determined to be errors, and not any matter assigned as error but determined not to be erroneous." *Sweet*, ¶ 40, 234 P.3d at 1207. Because I see only one error—the use of foul language during closing argument—there is no error to cumulate. Even assuming, arguendo, the errors found by the majority are in fact errors, they did not cumulatively deprive Mr. Bogard of a fair trial. There is no reasonable possibility that, in the absence of the errors, the verdict would have been more favorable to Mr. Bogard.

[¶124] The majority's cumulative error analysis turns largely on the strength (or lack thereof) of the State's case. It concludes, and I agree, the central issue at trial was whether SK consented. Obviously, that determination was based largely upon whether the jury found SK or Mr. Bogard more credible. However, there was more to the State's case than the victim's and Mr. Bogard's differing accounts of what happened that night. Rather, the physical evidence and the testimony of other witnesses corroborated SK's testimony and demonstrated Mr. Bogard's story was not credible.[28]

---

[28] Mr. Bogard did not testify at the second trial, but his testimony from the first trial was read into the record by the State.

[¶125] The SANE nurse testified SK had an actively bleeding laceration inside her vagina consistent with "blunt force trauma." DNA consistent with Mr. Bogard was also found on her vaginal swabs. I agree with the majority these findings do not necessarily rule out Mr. Bogard's version of events, i.e., that he stopped as soon as he realized the sexual encounter was no longer consensual.[29] While, as the SANE nurse testified, the presence of an injury from a sexual encounter does not conclusively establish SK did not consent, the jury was certainly entitled to make that inference. Furthermore, the locations of the laceration and Mr. Bogard's DNA inside SK's vagina are significant. As the majority recognizes, the laceration was found one inch inside SK's vagina. What it fails to state, however, is Mr. Bogard's DNA was found more than one inch inside her vagina. The locations of the laceration and Mr. Bogard's DNA undermine Mr. Bogard's claim he only "slightly" penetrated SK's vagina before she violently pulled away. SK, on the other hand, testified Mr. Bogard "put his penis in [her vagina]." The physical evidence supports her story.

[¶126] Not only that, Mr. Bogard's version of what happened that night was inconsistent with the testimony of other witnesses. Mr. Bogard testified he pulled up his pants and left after SK "violently" pulled away for the second time. He "couldn't believe it" and was "shocked" over having been just rejected. Yet, upon leaving the bathroom, he immediately told Cactus Aanenson, one of the bartenders, "When this gal comes out of here, we got to give her a slow clap." Mr. Aanenson took this comment to be an "affirmation of some fooling around, some hooking up." Mr. Bogard's statement to the bartender is inconsistent with his account that he was "shocked" over having been rejected.

[¶127] Moreover, two of Mr. Bogard's platonic girlfriends testified they talked to him about the incident, and he claimed no sexual intercourse occurred. Yet, at trial, he admitted he "slightly" penetrated SK's vagina. If no sexual intercourse occurred as Mr. Bogard told his friends, SK would not have ended up with a laceration and Mr. Bogard's DNA one inch and more inside her vagina. Mr. Bogard's inconsistent statements went to the critical issue of consent and undermined his credibility and his defense. His story does not add up.

[¶128] Admittedly, there were minor inconsistencies in SK's story, including how much she drank at the Ranger bar, the location of her costume on her body, how Mr. Bogard led her into the bathroom, whether she used the word "no" or "stop" to indicate her lack of consent, and whether Mr. Bogard said anything inside the bathroom. But she never wavered that Mr. Bogard locked the door, turned off the lights, penetrated her vaginally while she was leaning over the bathtub and accused her of being too tight, all while she told him "no" or "stop," she wanted to be with her friends, or words to that effect.

---

[29] Although the jury would not have been so aware, the majority is certainly aware of the significance of the presence of a physical injury. As our case law demonstrates and experience shows, the presence of physical injury in sexual abuse or assault cases is rare. *See, e.g.*, *Winters v. State*, 2019 WY 76, ¶ 6, 446 P.3d 191, 197-98 (Wyo. 2019); *Martinez v. State*, 2018 WY 147, ¶¶ 20-21, 432 P.3d 493, 498 (Wyo. 2018); *Butler v. State*, 2015 WY 119, ¶ 7, n.1, 358 P.3d 1259, 1262 n.1 (Wyo. 2015).

[¶129]  The majority also concludes "that much of the prosecutorial misconduct went to the very heart of SK's and [Mr. Bogard's] credibility on the central issue of consent" and was severe and pervasive.  I respectfully disagree.  The only way the references to Ms. K's "negative experience" bolstered SK's credibility is if the jury were to infer it meant nonconsensual sex.  But, the inferences from such reference are endless.  Indeed, the only inference the majority could draw from Ms. K's testimony was it referred to an unpleasant sexual encounter, not rape.  Even if we assume the jury inferred Mr. Bogard and Ms. K had an unpleasant sexual encounter, it is pure speculation that the jury would have concluded he acted in conformity with the prior bad act by raping SK.

[¶130]  The prosecutor's comments regarding SK consistently crying since the assault and dropping out of school occurred during a lengthy closing argument.  Because the district court sustained Mr. Bogard's objection to them, we must presume the jury disregarded them.  Similarly, because any misstatement of the facts occurred during closing argument, we presume the jury did not consider them as evidence.  Finally, the use of a single word expletive, while distasteful, did not bolster SK's credibility.  Indeed, it more likely offended the jury.

[¶131]  Mr. Bogard's trial was certainly not perfect; few are.  But it was fair and that is all that is required.  *Law v. State,* 2004 WY 111, ¶ 41, 98 P.3d 181, 195 (Wyo. 2004).  I would affirm the jury's verdict.